LOWER MAIN STREET ASSOCIATES, A NEW JERSEY LIMITED PARTNERSHIP AND A LIMITED DIVIDEND HOUSING ASSO-CIATION; AND UNION PLAZA ASSOCIATES, A NEW JERSEY LIMITED PARTNERSHIP AND A LIMITED DIVIDEND HOUS-ING ASSOCIATION, PLAINTIFFS–APPELLANTS AND CROSS–RESPONDENTS, v. NEW JERSEY HOUSING AND MORTGAGE FINANCE AGENCY, STATE OF NEW JERSEY, DEFENDANT–RESPONDENT AND CROSS–APPELLANT.

Argued September 13, 1988—Decided February 22, 1989.

*Frederic K. Becker* argued the cause for appellants and cross-respondents (*Wilentz, Goldman & Spitzer,* attorneys, *Frederic K. Becker* and *Gordon J. Golum,* of counsel and on the briefs).

*Richard L. Evert,* Deputy Attorney General, argued the cause for respondent and cross-appellant (*Cary Edwards,* Attorney General, attorney, *Michael R. Clancy,* Deputy Attorney General, of counsel).

The opinion of the Court was delivered by

STEIN, J.

In 1984, the New Jersey Housing Mortgage and Finance Agency (HMFA) adopted a new rule, *N.J.A.C.* 5:80–5, regulating the transfer of ownership interests in housing projects financed by the Agency and its predecessors, the Housing Finance Agency (HFA) and the Mortgage Finance Agency (MFA). (15 *N.J. Reg.* 2090–95). We consider in this case challenges to the validity of three regulations adopted as part of the Rule. *N.J.A.C.* 5:80–5.10 prohibits prepayment of mortgage loans without prior approval by HMFA; *N.J.A.C.* 5:80–5.8 provides that if an agency-financed project is sold and the underlying mortgage prepaid, profits in excess of an eight-percent return on the seller's equity must be paid to HMFA as an

additional fee for approval of the sale; and *N.J.A.C.* 5:80–5.9 imposes various processing fees on sellers in connection with the sale of agency-financed housing projects.

In a direct appeal to the Appellate Division pursuant to *Rule* 2:2–3(a)(2), plaintiffs, Lower Main Street Associates (Lower Main) and Union Plaza Associates (Union), contended that the regulations were contrary to the terms of their financing agreements with HFA, and inconsistent with HMFA's enabling legislation. They also claimed that the regulations violated the contracts clauses of the federal and state constitutions, *U.S. Const.* art. I, § 10, and *N.J. Const. of 1947* art. IV, § 7, para. 3, as well as the "takings" clause of the federal constitution. *U.S. Const.* amends. V and XIV.[1] The Appellate Division upheld the validity of two of the three regulations, those limiting the right of prepayment and the return on equity in the event of sale of an agency-financed project, but struck down the imposition of closing fees as "patently excessive and thus invalid * * *." *Lower Main Assocs. v. New Jersey Hous. & Mortgage Fin. Agency*, 219 *N.J. Super.* 263, 278 (1987).

We affirm the judgment of the Appellate Division invalidating the regulation that imposes closing fees, *N.J.A.C.* 5:80–5.9. With respect to the restriction on prepayment of agency-financed mortgages, we are in accord with the Appellate Division's conclusion that plaintiffs' mortgages cannot be construed to confer on the mortgagors the right to prepay at any time after the agency's underlying bonds are redeemable. Thus, the regulation restricting prepayment is not in conflict with the underlying agreements between plaintiffs and HMFA. Nevertheless, we hold the regulation to be invalid because it provides no standards whatsoever to guide HMFA's exercise of discretion in determining whether to approve requests for prepayment of an agency-financed mortgage loan. We also conclude

---

[1] In view of our disposition of this matter on non-constitutional grounds, we need not and do not address plaintiffs' contentions that the regulations are unconstitutional.

that the regulation restricting return on equity, after sale of an agency-financed project and prepayment of the underlying mortgage, cannot in its present form be reconciled with the underlying statutory authorization; moreover, this regulation appears to have been adopted, at least in part, for a purpose different from that advanced by HMFA. Accordingly, we invalidate *N.J.A.C.* 5:80–5.8. We thus affirm in part and reverse in part the judgment of the Appellate Division.

## I.

HMFA, established by the New Jersey Housing and Mortgage Finance Agency Act of 1983 (HMFA Act), *L.*1983, *c.* 530, is a consolidation of two prior agencies, the New Jersey Housing Finance Agency (HFA), and the New Jersey Mortgage Finance Agency (MFA). Prior to the establishment of the HMFA, the HFA financed construction of moderate-income housing through the issuance of tax-exempt bonds. *N.J.S.A.* 55:14J–34(f) (*repealed by* HMFA Act, codified at *N.J.S.A.* 55:14K–1 to –44). Under the HMFA Act, the HMFA assumed the obligations of the HFA bonds, *N.J.S.A.* 55:14K–4d, and was authorized to issue its own tax-exempt bonds in order to finance low- and moderate-income housing. *See N.J.S.A.* 55:14K–2e(2); 55:14K–20.

Lower Main and Union are limited partnerships, organized in 1969 and 1970 respectively, under the Limited–Dividend Housing Corporations Law, *N.J.S.A.* 55:16–1 to –22. Union borrowed $5,835,000 from HFA in 1969 to construct a 240–unit housing project in Union City. Lower Main borrowed $7,665,000 from HFA in 1971 to finance construction of a 288–unit housing project in Rahway. Both loans were for ninety percent of the cost of the respective projects, and had fifty-year maturities. The HFA issued short-term bond anticipation notes in 1971 to generate the funds required for the loans.

Concurrently with the closing of the loans, and in compliance with HFA's enabling legislation, *N.J.S.A.* 55:14J–9 (*repealed by* HMFA Act, codified at *N.J.S.A.* 55:14K–1 to –44), Lower Main and Union entered into regulatory agreements with HFA that were to remain in effect until the loans were repaid. The agreements imposed limitations on rents, management, and tenant eligibility, and also limited the amount of annual distributions to Lower Main and Union to eight percent of their respective equity investment in the housing projects.

In 1972, HFA issued its 1972 Series A General Housing Loan Bond and used the proceeds to retire the short-term bond anticipation notes and to provide permanent mortgage financing to Lower Main and Union. The Series A Bonds matured on November 1 of each year in principal amounts set forth in the bond resolution. Bonds maturing prior to November 1983 were not redeemable by HFA; bonds maturing on and after November 1, 1983, were redeemable after November 1, 1982, at the agency's option. Concurrently with the issuance of the Series A bonds, Lower Main and Union executed so-called "conforming" mortgages to insure consistency between the mortgages and the provisions of the bond resolution.

Rule 5:80–5 was proposed by HMFA in May 1984. 16 *N.J. Reg.* 951. It was adopted by the Agency in the form proposed in June 1984, and became effective August 6, 1984. 16 *N.J. Reg.* 2091. In July 1985, plaintiffs instituted this proceeding pursuant to *Rule* 2:2–3(a)(2), challenging three of the regulations included in *N.J.A.C.* 5:80–5.[2] As noted above, the Appel-

---

[2]In 1984, Lower Main fell behind in its loan payments to HMFA, accumulating arrearages that at one point amounted to $1,994,615. As a result, HMFA instituted a foreclosure action, which it subsequently withdrew in return for Lower Main's commitment to pay the arrearages pursuant to a refinancing plan. The terms of the settlement provided that Lower Main was to pay only the interest on the arrearages in monthly installments until the year 2006, at which time the entire balance was due and payable in full. The settlement agreement also provided that if other agency-financed projects were permitted to convert to condominium or cooperative ownership, Lower Main's project

late Division upheld *N.J.A.C.* 5:80–5.10, which prohibits prepayment of mortgage loans without HMFA approval, and also sustained *N.J.A.C.* 5:80–5.8, which restricts the amount of profit a sponsor of an agency-financed project may retain if the project is sold and the agency's mortgage prepaid. The Appellate Division invalidated *N.J.A.C.* 5:80–5.9, which imposes various processing fees in conjunction with the sale of agency-financed projects. We granted plaintiffs' petition for certification and also granted HMFA's cross-petition addressed to *N.J.A.C.* 5:80–5.9. 109 *N.J.* 47 (1988).

## II.

HMFA's prepayment regulation, *N.J.A.C.* 5:80–5.10, provides that "[p]repayment of the mortgage loan made by the Agency is prohibited without the prior written approval of the agency." Although plaintiffs incidentally challenge this regulation as unauthorized by the HMFA Act, their principal contention is that the regulation conflicts with the right of prepayment expressly conferred by the mortgages executed by plaintiffs and HMFA to secure the project loans. Plaintiffs argue that HMFA cannot adopt a regulation that contradicts an express prior agreement by the Agency that recognizes plaintiffs' right to prepay their mortgages.

Plaintiffs rely specifically on the following excerpt from paragraph 6 of the conforming mortgages:

> That the Mortgagor shall not make any advance principal payment prior to the date on which all of the Bonds issued by the Mortgagee for the purpose of obtaining funds with which to make this Mortgage Loan are redeemable. *With respect to any advance principal payment so permitted thereafter,* the Mortgagor shall pay an amount equal to the aggregate of (i) the principal amount of the Mortgagor's Mortgage Loan Obligations (as determined pursu-

---

would "be treated consistently with the treatment afforded by the HFA to such other projects." In a related proceeding before the Office of Administrative Law, Docket No. A–11–86T7, Lower Main is seeking enforcement of this aspect of the agreement, contending that the HFA has permitted a similar project to convert to cooperative ownership.

ant to the Bond Resolution) remaining unpaid, (ii) the Mortgagor's Housing Finance Fund Obligations (as determined pursuant to the Bond Resolution) remaining unpaid, (iii) the interest to accrue on all Bonds of the Mortgagee to be redeemed by the Mortgagee upon the making of such advance principal payment to the next call date thereof not previously paid by Mortgagor, (iv) the call premium, if any, on the Bonds so to be redeemed, and (v) the cost and expenses of the Mortgagee in effecting the redemption of the Bonds so to be redeemed, less the amount of monies available under the provisions of the Bond Resolution for application to the redemption of the Bonds so to be redeemed, as determined by the Mortgagee * * *. (Emphasis added.)

Lower Main and Union contend that paragraph six of their respective mortgages bars prepayment by the mortgagors only until the underlying bonds are redeemable by HMFA. Relying on the phrase, "[w]ith respect to any advance principal payment so permitted thereafter," plaintiffs assert that the mortgagors are unconditionally "permitted" to make prepayments at any time after the bonds are subject to redemption. Because the bond resolution authorizes redemption after November 1, 1982, of all bonds maturing on or after November 1, 1983, plaintiffs construe the mortgages as authorizing prepayment at any time after November 1, 1982.

The Appellate Division rejected plaintiffs' construction of paragraph six of the conforming mortgages. Acknowledging that the mortgagors had no "common law or statutory right to prepay the mortgage loans," 219 *N.J.Super.* at 270, the court considered the provisions of paragraph six in the context of the relationship between plaintiffs and the HFA when the conforming mortgage was executed:

With these interpretative principles in mind, we conclude that the phrase "so permitted thereafter" in the conforming mortgages was intended to permit prepayment after redeemability of the finance bonds only as permitted by the mortgagee, HMFA. What is clear from the mortgages and regulatory agreements signed by plaintiffs is that the agency was lending funds to carry out a public purpose: to provide financing to private industry for the construction of affordable middle-income rental housing. Plaintiffs accepted the mortgage proceeds for that purpose and enjoy the benefits of low interest rates and a mortgage term of 50 years. In turn, plaintiffs agreed to regulatory control of the units by the agency. All parties recognize that the agency's control over selection of prospective tenants, rental charges and project management is co-extensive with the life of the mortgages, since the regulatory contracts by their very terms expire upon satisfaction of the mortgages.

Considering the purpose of the project loans and the attendant benefits enjoyed by plaintiffs, the prepayment clause must be interpreted as intending to repose in the agency unfettered control over when and how the mortgages can be satisfied after the bonds become redeemable. Otherwise, mortgagors could reap the benefits of the HMFA mortgage terms and thereafter prepay at will once the finance bonds become redeemable, thereby escaping regulatory control. To allow prepayment would invite flight from the low and middle-income market, thus frustrating the very purpose of the HMFA statutory scheme. Plaintiffs alone would have the capacity of removing from the affordable housing market 528 units upon prepayment of the mortgages. We cannot conceive that the parties intended to foster building and maintain affordable housing only for the period the finance bonds remain unredeemable. Rather, it is in keeping with the legislative goals to conclude that the parties intended to provide affordable housing for the life of the mortgages. We are therefore satisfied that the language "so permitted thereafter" was intended to maintain HMFA control over prepayment after redeemability of the finance bonds. [*Id.* at 271–72.]

■ We are fully in accord with the Appellate Division's reasoning and conclusion concerning the proper construction of paragraph six of the mortgage. We would observe additionally that to the extent paragraph six of the mortgage may be read to authorize any prepayment, that prepayment must include five components that are identical to the components of an advance payment specified in the corresponding provision of the bond resolution:

(i) the principal amount of the Mortgagor's Mortgage Loan Obligations remaining unpaid, (ii) the Mortgagor's Housing Finance Fund Obligations remaining unpaid, (iii) the interest to accrue on all Bonds to be redeemed upon the making of such Mortgage Advance Amortization Payment to the next call date thereof not previously paid by the Mortgagor, (iv) the call premium on the Bonds so to be redeemed, and (v) the costs and expenses of the Agency in effecting the redemption of the Bonds so to be redeemed * * *.

Significantly, these components of an authorized prepayment by the mortgagor appear to have been included in the mortgage expressly for the purpose of meeting HMFA's requirements in the event of a bond redemption, which under the bond resolution is a matter entirely within the Agency's discretion. Thus, the very definition of an authorized prepayment under the mortgage bespeaks the necessity of advance approval by the agency, without which neither a bond redemption nor a mortgage prepayment is permissible.

■ Accordingly, we find no inconsistency between the challenged regulation forbidding prepayment without the HMFA's approval and the terms of the underlying mortgages. Nevertheless, we find the regulation invalid in view of its failure to specify or suggest any criteria or standards to guide the agency in the exercise of its discretion to grant or withhold approval of a borrower's request to prepay an agency-financed mortgage loan.

HMFA's enabling legislation is silent on the subject of prepayment. Although we have no doubt concerning the agency's power to act by rulemaking on the issue, it is by now a settled principle that administrative agencies, particularly where the underlying statute is silent, should "articulate the standards and principles that govern their discretionary decisions in as much detail as possible." *Crema v. New Jersey Dep't of Envtl. Protection*, 94 *N.J.* 286, 301 (1983) (quoting *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 *F.*2d 584, 598 (D.C.Cir. 1971)). The principle at issue is no less than a matter of due process:

> " '[D]ue process means that administrators must do what they can to structure and confine their discretionary powers through safeguards, standards, principles and rules.' * * * This principle employs no balancing approach but simply holds that due process requires some standards, both substantive and procedural, to control agency discretion." [*Crema v. New Jersey Dep't of Envtl. Protection, supra*, 94 *N.J.* at 301 (quoting *Historic Green Springs, Inc. v. Bergland*, 497 *F.Supp.* 839, 854 (E.D.Va.1980)).]

We have on several occasions invalidated the actions of administrative agencies when there was a significant failure to provide either statutory or regulatory standards that would inform the public and guide the agency in discharging its authorized function. *See Department of Envtl. Protection v. Stavola*, 103 *N.J.* 425, 436–38 (1986); *Department of Labor v. Titan Constr. Co.*, 102 *N.J.* 1, 12–18 (1985); *Crema v. New Jersey Dep't of Envtl. Protection, supra*, 94 *N.J.* 286. We do not anticipate that invalidation of this regulation will prejudice the Agency's regulatory efforts because, as the Appellate Divi-

sion recognized, there is no statutory or common-law right to prepay these mortgages.[3]  219 *N.J.Super.* at 270.

Our traditional role in the review of administrative regulation is highly circumscribed. Our strong inclination, based on the principle that the coordinate branches of government should not encroach on each other's responsibilities, is to defer to agency action that is consistent with the legislative grant of power. *A.A. Mastrangelo, Inc. v. Department of Envtl. Protection,* 90 *N.J.* 666, 687 (1982); *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 562 (1978). But deference does not require abdication by the judiciary of its function to assure that agency rulemaking conforms with basic tenets of due process, and provides standards to guide both the regulator and the regulated. Thus, we invalidate *N.J.A.C.* 5:80–5.10 in view of its omission of adequate standards, and we leave to the agency the task of reformulating the regulation in a manner consistent with the principles expressed in this opinion.

III.

A more complex issue is posed by *N.J.A.C.* 5:80–5.8, which provides in part that if an HMFA-financed project is sold and the underlying mortgage prepaid, any profits exceeding an eight-percent return on the seller's equity must be remitted to the agency as an additional fee for approval of the sale. Ironically, this regulation purports to limit profits when an agency-financed project, by virtue of prepayment of the underlying mortgage, is sold free and clear of the agency's restric-

---

[3]We also observe that the Agency's Summary of Rule 5:80–5, which deals generally with the transfer of ownership in HMFA housing projects, indicates that the Rule assumes "a continuation of the status of the project after it is transferred." 16 *N.J. Reg.* 951. Accordingly, it appears likely that the Agency would be favorably disposed to requests for mortgage prepayments that were conditioned on a continuation of the regulated status of the housing project. This is illustrative, but not exhaustive, of the criteria that might appropriately be included in a regulation designed to provide fair notice of the factors that will guide HMFA's discretionary authority over prepayment requests.

tions; but the regulation imposes *no limit* on profits when an agency-financed project is sold without prepayment of the agency's mortgage and remains subject to all the agency's restrictions and regulations.[4]

The regulation is also perplexing when it is examined in the context of the underlying statutory provisions and the provisions of the regulatory agreement that agency-financed housing sponsors are required to sign. The HMFA Act itself imposes no specific limit on profits, either from operation or sale of projects financed by the Agency. However, *N.J.S.A.* 55:14K–7(a)(6) provides that the sponsors of projects financed by HMFA must enter into agreements with the Agency limiting the sponsor to a rate of return, from operations as well as sale of the project, to be fixed by HMFA from time to time by regulation, taking into account prevailing rates of return on similar investments, risks associated with the project, and other factors. The statute also provides that agreements between sponsors and the agency's predecessors shall continue to be

---

[4]The full text of *N.J.A.C.* 5:80–5.8 is as follows:

5.80–5.8   Return on equity

(a) The equity base used for calculating allowable return on equity shall be determined by the Agency as a function of the total development cost of the project rather than the purchase price unless the purchase price is less than the total development cost in which case the purchase price will be used by the Agency to determine the equity base.

(b) In conjunction with permitted prepayments of the Agency's mortgage, the mortgagor shall be limited to a cumulative return on its investment of 8 percent per annum. This limit shall include any return from project operations or on sale of the project.

1. Upon sale or other disposition of the project or any interest thereon, any amounts realized by the seller in excess of 8 percent shall be paid to the Agency as an additional fee for approving the transfer.

2. With regard to transfers which do not involve prepayment of the agency's mortgage which recognize the agency's right to approve any prepayment which preserve the low and/or moderate income nature of the project and which fully comply with all Agency rules, regulations and policies, the limit shall apply only to revenues received from operations and no such limit on return on equity shall apply to money earned from the sale of the project or any other sale of ownership interests.

subject to any restrictions on rate of return imposed by prior law, unless modified by HMFA's regulations.

The reference in section 7(a)(6) of the HMFA Act to "restrictions on rate of return imposed by prior law" implicates the provisions of the HFA Act, which was the controlling law when the regulatory agreements between plaintiffs and HFA were executed. The relevant portion of the HFA Act provided that

[t]he loan shall be subject to an agreement between the agency and the qualified housing sponsor *limiting* said qualified housing sponsor, and its principals or stockholders, *to a return of 8% per annum* of its investment in any housing project assisted with a loan from the agency. *No qualified housing sponsor* which is permitted by the provisions of the law under which it is organized or incorporated to earn a return on its investment, nor any of the principals or stockholders of such qualified housing sponsor, *shall at any time earn, accept or receive a return greater than 8% per annum of its investment* in any housing project assisted with a loan from the agency, *whether upon the completion of the construction* or rehabilitation of such project, *or upon the operation* thereof, *or upon the sale,* assignment or lease of such project to any other person, association or corporation. Any person, association or corporation who shall be found guilty of violating the provisions of section 9(a)(6) of this act shall be a disorderly person and subject to a fine of not less than $500.00 or more than $2,500.00. [*L.*1967, *c* 81, § 9(a)(6) (repealed) (emphasis added).]

Thus, the HFA Act appears to impose an annual limit of an eight-percent return on equity to sponsors of agency-financed projects, whether the return is generated from operations or sale of the project. The statute is not specific with respect to its application to projects initially financed by the HFA but whose loans have been repaid.

The provisions of the HFA Act that restrict return on investment from sale of agency-financed projects appear to conflict with provisions of the Limited Dividend Act, *N.J.S.A.* 55:16–1 to –22, the statute under which Lower Main and Union Plaza were organized. *N.J.S.A.* 55:16–5 provides:

*Every* stockholder of a *housing corporation* shall be deemed, by the subscription to or the receipt of stock therein, to have *agreed that he shall at no time receive* from the corporation *in repayment of his investment any sums in excess of the face value of the investment plus cumulative dividends at a rate not to exceed 8% per annum* * * *. Upon the dissolution of any such housing corporation or housing association *any surplus* in excess of such amounts *shall be paid to the State* of *New Jersey;* provided, however, that the

authority may enter into agreements with any municipality where tax exemption is provided pursuant to section 18 of the act with respect to any project or projects of such housing corporation or association for the distribution to and apportionment of said surplus between the State and the municipality. (Emphasis added) (footnote omitted.)

However, *N.J.S.A.* 55:16–5.1 defines surplus to exclude appreciation realized on the sale of assets owned by a limited dividend housing corporation:

> As used in section 5 of the act [*N.J.S.A.* 55:16–5] to which this act is a supplement, and as used in any statute amendatory of or supplementary to said act, *the term "surplus" shall not be deemed to include any increase in assets* of any limited-dividend housing corporation or housing association organized in accordance with the provisions of said act or any supplement thereto, by reason of reduction of mortgage, by amortization or similar payments or *realized from the sale or disposition of any assets of a housing corporation or housing association to the extent such surplus can be attributed to any increase in market value* of any real or tangible personalty accruing during the period such assets were owned and held by any such housing corporation or housing association. (Emphasis added.)

This exclusion of sale profits from the definition of "surplus" resulted from a 1967 amendment to the Limited Dividend Law, *L.*1967, *c.* 112. The sponsor's statement explained that "the changes would make investing in this type of housing more attractive by enabling the sponsor to retain any increase in market value due to general changes in the real estate market." Senate No. 364, *L.*1967, *c.* 112.

Facially, the provisions of the Limited Dividend Law exempting from "surplus" the profits from sale of corporate assets appear to contradict the provisions of the HFA Act limiting return on investment realized from the sale of agency-financed housing projects. Although the amendment to the Limited Dividend Law was adopted subsequent to the enactment of the Housing Finance Agency Act, *L.*1967, *c.* 81, we note that section 30(a) of the HFA Act provides that if any other statute conflicts with the provisions of the HFA Act, *"the provisions of this act shall be enforced and the provisions of such other acts* and rules and regulations adopted thereunder *shall be of no force and effect."* (Emphasis added.)

We need not resolve this apparent statutory conflict to decide the matter before us. However, in view of the significance accorded in the HMFA Act to regulatory agreements between the HFA and its borrowers concerning restrictions on rate of return, *N.J.S.A.* 55:14K–7a(6), we focus our attention on the provisions of the regulatory agreements between plaintiffs and the HFA. Both regulatory agreements prohibit sale of the mortgage housing projects without approval of the agency. Paragraph 6(e) of the regulatory agreements between HFA and both Lower Main and Union provides as follows:

> 6. The Owner shall not without the prior written approval of the Agency
> * * *
>
> *      *      *      *      *      *      *      *
>
> (e) Make, or receive and retain, any distribution of assets or any income of any kind of the Project except from "surplus cash" and except in the following conditions:
>
> (1) All distributions shall be made only as of and after the end of the annual fiscal period, and only as permitted by law; all such distributions in any one fiscal year *shall be limited to eight per centum on the equity investment* and the right to such distributions shall be cumulative. (Emphasis added.)

Both regulatory agreements also provide that they "shall be operative until the mortgage is satisfied."

Thus, read literally, the HFA regulatory agreements with plaintiffs, the enforceability of which is preserved by the HMFA enabling legislation, prohibit sale of the projects without Agency approval and also prohibit annual distributions exceeding eight percent of the owner's equity investment. Both restrictions terminate, however, when the mortgage is paid. In contrast, the regulation before us, *N.J.A.C.* 5:80–5.8, limits profits on sale of agency-financed projects *only* in the event of prepayment of the mortgage, and not when the mortgage remains in force. On its face, the regulation appears to conflict both with HFA's regulatory agreements with plaintiffs, and with the HMFA's enabling legislation, which accords recognition to such regulatory agreements and to the provisions of prior law those agreements purport to implement.

Our understanding of this regulation is illuminated by a memorandum dated November 30, 1983, from Richard H. Godfrey. Jr., Director to Policy Development of HFA, to the Agency's syndication subcommittee.[5]  The Godfrey memorandum refers to a proposed regulation concerning transfers of Agency-financed projects, and acknowledges the "confusion" arising from the conflicting provisions of the HFA Act and the Limited Dividend Law concerning whether profits from sale of Agency-financed projects are restricted or unrestricted.  The memorandum notes that in the past neither the HFA nor federal or other state agencies had considered profits realized on syndication of agency-financed projects as subject to the return-on-equity limitations.  The memorandum suggests that the HFA should also permit sales of Agency-financed projects free from limitations on return on equity to encourage and attract investment in such projects.  In addition, the memorandum addresses the problem of mortgage prepayments, expressing concern that the Agency's policy prohibiting prepayment of mortgages without approval might successfully be challenged in court.

Accordingly, the memorandum concludes with the recommendation that the Agency adopt a regulation that would eliminate any restrictions on return on equity for sales that "maintain[ ] the Agency's mortgage * * *," proposing that such sales "receive treatment as all syndication[s] and resyndications have in the past."  The Godfrey memorandum candidly acknowledges the apparent inconsistency between the proposed regulation and the HFA Act: "It may be argued that the Agency should not issue a policy with respect to return on equity which appears to contradict its own statute."  Nevertheless, the Godfrey memorandum justifies the proposed regulation as "needed to fill the regulatory void created by the adoption of the merger

---

[5]The November 30, 1983, memorandum of Richard H. Godfrey, Jr. was added to the record in this matter in April 1987 by the filing with the Clerk of the Appellate Division a Second Supplemental Statement of Items Comprising the Record on Appeal.

legislation," [6] and advantageous because it "encourages the infusion of capital into the projects * * *." The Godfrey memorandum justifies the continued limitation on profits when sale of a project occurs in conjunction with prepayment of the Agency's mortgage as providing "an alternative restriction in the event that our absolute prohibition on prepayment is defeated in the courts." In fact, the memorandum suggests, over-optimistically it would appear, that the "alternative regulation * * * may prevent challenges to the absolute prohibition."

On this record, the Godfrey memorandum would appear to be a highly reliable source of legislative history concerning the Agency's purpose in adopting *N.J.A.C.* 5:80–5.8. The State has not contended that the memorandum is inaccurate in any material respect, and the regulation as adopted is entirely consistent with the recommendations contained in the Godfrey memorandum. Because we are otherwise unable to reconcile the regulation with the enabling legislation or with the HFA Act, we find unavoidable the conclusion that the regulation under review was adopted for many of the reasons suggested in the Godfrey memorandum.

■ Whether or not that is so, the regulation cannot be sustained. Apart from the Godfrey memorandum, the regulation adopts the principle, unauthorized by the HMFA Act, that only sales of Agency-financed projects remaining subject to the Agency's mortgage are free from limitation on return on equity. Clarified by the Godfrey memorandum, the regulation appears designed to discourage prepayment of the Agency's mortgages, in the event the Agency's prohibition on prepayment is invalidated, by requiring a sponsor that prepays a mortgage and sells the financed project to forfeit to the Agency that portion of the profit that exceeds an eight-percent return

---

[6]The HMFA Act eliminates any specific limitations on return on equity from Agency-financed projects, but authorizes the Agency to impose such limitations by regulation. *N.J.S.A.* 55:14K–7(a)(6).

on equity. In contrast, the Agency asserts that the purpose of the regulation is to regulate the return on equity from Agency-financed projects. 16 *N.J. Reg.* 2093. Assuming as we do that the reasons for the regulation are those stated in the Godfrey memorandum, the regulation constitutes a misuse by the Agency of its rulemaking power, because the actual purpose for the adoption of at least a portion of the regulation is different from the purpose stated by the Agency.

If HMFA's objective is to restrict mortgage prepayment in order to achieve its statutory responsibilities, it should deal with prepayment by rulemaking, establishing criteria and standards to guide both the agency and its housing-project sponsors. *Supra* at 236–237. The Agency should not, as it apparently has attempted to do here, assume its inability lawfully to restrict prepayment, and then purport to achieve indirectly what it believes it cannot accomplish lawfully. Judicial resolution of any challenges asserted to such a regulation will eventually clarify the scope of the Agency's power to restrict prepayment of its mortgages.

As stated above, the judiciary's role in reviewing agency rulemaking is a limited one. *Supra* at 236. But however circumscribed the judicial function may be, its limits plainly encompass the duty to set aside agency rulemaking unauthorized by or inconsistent with the agency's enabling legislation. *Parisi v. North Bergen Mun. Port Auth.,* 105 *N.J.* 25, 38–39 (1987); *Common Cause v. New Jersey Election Law Comm'rs,* 74 *N.J.* 231, 243 (1977); *Cole Nat'l Corp. v. State Bd. of Examiners,* 57 *N.J.* 227, 231–33 (1970). Where, as here, it appears that the agency also has misused its rulemaking power to regulate one activity—mortgage prepayments—while purporting to regulate return on equity of agency-financed housing projects, our duty is clear and compelling. The very process of rulemaking contemplates public notice and public disclosure of an agency's regulatory objectives. *N.J.S.A.* 52:14B–4; *see Bally Mfg. Corp. v. New Jersey Casino Control Comm'n,* 85 *N.J.* 325, 332 (1981); *Matter of Casino Licensee,* 224 *N.J. Super.*

316, 324–25 (App.Div.1988). When an administrative regulation disguises an aspect of the agency's true regulatory purpose, it cannot be sustained as a proper exercise of the rulemaking power. Accordingly, we invalidate *N.J.A.C.* 5:80–5.8.

## IV.

Finally, we are fully in accord with the Appellate Division's conclusion that the fees imposed by *N.J.A.C.* 5:80–5.9 on the sale of an agency-financed project are "patently excessive and thus invalid." 219 *N.J.Super.* at 278. As the Appellate Division observed:

There is not even the slightest suggestion that the fees are reasonably related to the costs of monitoring the sale of a financed project. As we understand the regulation, a $10,000,000 cash sale without federal subsidy would require payment of fees to HMFA of 1.5 million dollars (15 percent of the cash purchase price) and $50,000 (one-half of one percent of the purchase price). This aggregate fee is exorbitant and clearly has no rational relationship to the agency cost of administering the sale of an agency financed project. [*Id.*]

The judgment of the Appellate Division is affirmed in part and reversed in part.

O'HERN, J., concurring in part, dissenting in part.

With but one exception, I concur in the well-reasoned opinion of the majority. Adhering to views that I expressed in dissent in *Woodland Private Study Group v. State*, 109 *N.J.* 62, 76 (1987), I do not join that portion of Part II of the majority opinion that would require the agency to enact regulations prior to exercising its governmental power to permit prepayment of its mortgage. Would we say that the exercise of judgment by the board of directors of a commercial lender with respect to prepayment of a mortgage would be arbitrary unless it has written regulations in place before it exercises its judgment? Why must government always have paper in place before it acts? *See* Smith, "Judicialization: The Twilight of Administrative Law," 1985 *Duke L.J.* 427 (administrative process has become so formalized that it has lost sight of original goal of effectuating governmental policy).

O'HERN, J., concurring in part and dissenting in part.

*For affirmance in part and reversal in part*—Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—5.

*Opposed*—None.