676 A.2d 161

IN RE CAFRA PERMIT NO. 87–0959–5 ISSUED
TO GATEWAY ASSOCIATES.

Superior Court of New Jersey
Appellate Division

Argued February 27, 1996—Reargued April
16, 1996—Decided May 21, 1996.

500

Before Judges BAIME, VILLANUEVA and KIMMELMAN.

*Gordon N. Litwin* argued the cause for appellants American Littoral Society, D.W. Bennett, and Richard Crema (*Ansell, Zaro, Bennett & Grimm,* attorneys; *Mr. Litwin,* of counsel; *Susan M. Kennedy,* on the brief).

*Rachel Horowitz,* Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (*Deborah T. Poritz,* Attorney General, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel; *Ms. Horowitz,* on the brief).

*Jack Plackter* argued the cause for respondent Gateway Associates (*Horn, Goldberg, Gorny, Daniels, Plackter & Weiss*, attorneys; *Mr. Plackter*, of counsel and on the joint brief; *Sally E. Heckeroth*, on the joint brief).

*Alfred R. Scerni, Jr.* argued the cause for intervenor City of Pleasantville (*Mr. Scerni*, on the joint brief).

The opinion of the court was delivered by

BAIME, J.A.D.

Appellants, the American Littoral Society and its members, D.W. Bennett and Richard Crema individually, appeal the decision of the Commissioner of the Department of Environmental Protection (DEP) granting Gateway Associates' (Gateway) application for a major modification of its permit issued under the Coastal Area Facility Review Act (CAFRA) (*N.J.S.A.* 13:19–1 to –21). In granting the original permit, the DEP's Division of Coastal Resources (Division) waived the requirements of its bay island corridor policy, which restricts development of non-oceanfront islands surrounded by tidal waters. The development plans approved under the original CAFRA permit envisioned construction of an intercept parking lot designed to facilitate employee transportation to Atlantic City's casino and hotel complexes. The major modification granted by the DEP altered that component by replacing the intercept parking lot with a retail shopping center. The Division's prior waiver of its bay island corridor policy was "grandparented" in the DEP's approval of the major modification. Appellants, who did not appeal from the DEP's grant of the original CAFRA permit, now seek review of the major modification, contending that the agency lacked the power to waive its bay island corridor policy in the absence of a regulation authorizing such a waiver and establishing appropriate standards to guide the agency's decision to grant one. We agree and reverse.

## I.

The tortured procedural history and facts of this case are intertwined and require elucidation in order to understand the

complex issues presented. In 1984, Boardwalk Associates, Inc., a Los Angeles-based real estate and investment company, agreed with the City of Pleasantville that it would acquire and develop a 475 acre tract adjacent to a four mile stretch of the Atlantic City Expressway.

Boardwalk Associates proposed a multi-phased development of this property into, among other things: (1) fourteen major non-casino hotels (4,013 rooms), (2) a day care center and other commercial-type facilities including office space (200,000 square feet) and retail space (170,000 square feet); (3) a 115–acre wetlands mitigation site; and (4) a large permanent combination bus- and public-parking intercept facility for casino patrons and casino employees (with 1,550 parking spaces and an area for buses). Building would take place on 100 acres.

The site of the project was located between Pleasantville and Atlantic City on a former dredge disposal site set between Absecon Bay and Lakes Bay. A large part of the property consisted of coastal wetlands. The area was zoned for multi-use commercial activities and public facilities.

Informal discussions occurred on the "Gateway Project" between the DEP, Boardwalk Associates, and local officials throughout 1984 and 1985. On July 31, 1984, John Weingart, then the Director of the DEP's Division of Coastal Resources and the ultimate decision-maker on coastal developments, advised Boardwalk Associates that its proposed project would be considered acceptable if the company (1) satisfactorily addressed the project's impact on redevelopment in Atlantic City, and (2) showed (a) that the project's intercept parking component was feasible and (b) that the project would improve the ecological value of the site.

In the spring of 1985, Boardwalk Associates formally acquired the property. In the fall of 1985, the company transferred its ownership rights to a newly formed joint venture, Gateway Associates.

In June 1986, the DEP held public hearings to discuss a proposal to reclassify approximately ninety-six acres of Gateway's property from tidal wetlands to uplands. At the conclusion of the hearings, the DEP amended the coastal wetlands maps and approved the proposed reclassification.

Meanwhile, in February 1986, the DEP adopted the bay island corridor policy by promulgating *N.J.A.C.* 7:7E–3.24. The bay island corridor "is composed of non-oceanfront islands surrounded by tidal waters," *N.J.A.C.* 7.7E–3.24(a)(2), consisting of "that portion lying upland of wetlands and beaches but including the filled water's edge." *N.J.A.C.* 7.7E–3.24(a)(3). Although the bay island corridor policy has since been altered in various particulars and is now codified in *N.J.A.C.* 7:7E–3.21, *see* 26 *N.J.R.* 2990(a), 3046–47 (July 18, 1994), the essential outlines of its restrictions remain the same. "Water dependent development is discouraged on bay island corridors which do not abut a paved public road and [are] not served by a sewerage system with adequate capacity," while "[a]ll other types of development are prohibited in these areas." *N.J.A.C.* 7:7E–3.24(c). "On bay island corridors which abut a paved public road and sewerage system with adequate capacity, water dependent development is acceptable and all other development is acceptable only at a low intensity...." *N.J.A.C.* 7:7E–3.24(d).

Although the exact chronology of events is not altogether clear, at some point questions were raised concerning the applicability of the bay island corridor policy to Gateway's property. In light of appropriate "set asides," Gateway would have been permitted to develop twenty percent of the site if the policy was not applied. Application of the policy would have reduced permitted development to between three and five percent of the property. Gateway contended that the policy was not applicable because the site was not surrounded by tidal waters. On November 20, 1986, the Division apprised Gateway of its determination that the project site was an island corridor as defined in the regulation. Despite this finding, the Division concluded that it would be unfair to apply

the bay island corridor policy because it had never apprised Gateway or its predecessor in title of the "pending" change in use restrictions.

We digress to note that Atlantic City, Pleasantville and the DEP itself had long encouraged development of Gateway's property. It was envisioned that the project would create tax revenues, reduce unemployment, and solve traffic congestion problems. The proposed intercept parking facility was considered critical to achievement of these objectives. Among other documents contained in the voluminous record, this is perhaps best illustrated by an advisory memorandum prepared by the DEP's Planning Coordinator, in which he emphasized "[t]he need for a major intercept facility within five miles of [the] center [of] Atlantic City. . . ." Other documents also disclose that the DEP accorded priority to Gateway's proposed development because of the parking component. For example, applications by other developers to relax the requirements of the bay island corridor policy were rejected because, unlike the Gateway project, these proposals did not contain "any components which would serve the public interest." In one instance, the Division explained that Gateway's "proposed 4,000 space intercept parking area and transportation center [were] essential to the State's transportation planning for the Atlantic City region."

This point was further emphasized in the Division's decision not to apply the bay island corridor policy to Gateway's proposed development. In its decision letter, the Division stressed, "if the current proposal does not reach [fruition] and a different type of development is proposed for the site . . . the [bay] [i]sland [c]orridor [p]olicy would apply." In a subsequent letter "clarify[ing]" its position, the DEP noted "the exemption from the [bay island corridor] policy remains predicated upon the . . . determination that the proposed public transportation component satisfies the original intent of the exemption."

Further evidence of the critical nature of the intercept parking component was provided at the public hearings on Gateway's

application for a CAFRA permit. For example, Atlantic County supported the project because of its "strategic transportation importance and potential." Virtually all of the testimony supporting Gateway's application focused on the reduction in traffic congestion that would result from the intercept parking facility.

In August 1988, appellants for the first time objected to the proposed development and requested that the newly appointed Commissioner of the DEP, Christopher Daggett, review and reverse the decision not to apply the bay island corridor policy to the Gateway Project. Appellants also submitted written objections to the project, stating their belief that the proposed development violated the bay island corridor policy. Appellants continued to advance their position at the second public hearing conducted on April 18, 1989. Appellants objected to the waiver of the bay island corridor policy through both oral testimony and submission of extensive documentation. These objections were repeated after Gateway revised its proposal at the behest of the DEP's staff. The revised plan relocated the intercept parking facility to the largest area of contiguous uplands on the site, increased the number of parking spaces, eliminated all commercial office space and the majority of retail space, and set forth specific requirements regarding wetlands mitigation and wildlife management. However, appellants continued to urge that the bay island corridor policy should be strictly applied to the project.

On October 18, 1989, the DEP approved Gateway's CAFRA permit covering construction of (1) an interim 2,138–space casino employee parking lot, followed by a 4,000–space permanent employee parking area, (2) eight hotels, (3) 40,000 square feet of day care and other commercial facilities, (4) a twenty-acre dredge spoil area, (5) a 115–acre wetlands mitigation site, and (6) a 205–acre wildlife management area. As one of the conditions of the permit, Gateway was required to complete construction of all 4,000 permanent intercept parking spaces before it could begin hotel construction. In the attached summary report, the agency declared:

> [T]he great transportation need now is to resolve the continuing deficiency for hotel casino employee intercept parking which can be met here, at the Gateway site. The new commitment for 2,000 interim parking spaces and 4,000 total satisfies the Division [of Coastal Resources]' concern for public oriented use at this site.

No appeal was taken from the DEP's grant of the CAFRA permit.

In 1990, the DEP adopted a rule requiring all Atlantic City casinos to provide intercept parking facilities off Absecon Island at a minimum rate of one space per five employees as part of an effort to enhance ambient air quality standards and to reduce traffic congestion in Atlantic City. *See N.J.A.C.* 7:7E–7.5(d) (Transportation Use Policies); 22 *N.J.R.* 1188(a), 1210 (April 16, 1990); 22 *N.J.R.* 2542(b), 2567 (Aug. 20, 1990). This regulatory change was consistent with Gateway's permit and with the agency's requirement that Gateway complete construction of the intercept parking facility before starting hotel construction.

In 1991, the DEP abruptly changed course. For reasons which are not made clear in the record, the DEP suddenly began to discourage the concept of intercept parking for casino employees. Gateway was advised that the DEP would consider an application to modify its CAFRA permit and would continue to waive application of the bay island corridor policy if the planned intercept parking lot were replaced with a different use that would benefit the public. This suggestion was given added urgency by the DEP's subsequent adoption of an amended rule allowing all Atlantic City casinos to use alternative means to reduce vehicular traffic. *N.J.A.C.* 7:7E–7.5(d); 25 *N.J.R.* 1549(b), 1551–52 (April 5, 1993).

However, before Gateway submitted its application for a major modification of its CAFRA permit, we rendered our decision in *SMB Assocs. v. New Jersey Dep't of Envtl. Prot.*, 264 *N.J.Super.* 38, 624 *A.2d* 14 (App.Div.1993), *aff'd*, 137 *N.J.* 58, 644 *A.2d* 558 (1994). There, we held that the DEP did not have the authority to waive the bay island corridor policy "in the absence of a regulation, adopted pursuant to the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –15, authorizing waivers and establishing

appropriate standards for the exercise of waiver authority." 264 *N.J.Super.* at 50, 624 *A.2d* 14. We note that our decision was subsequently affirmed on another ground, the Supreme Court finding it unnecessary to resolve "the breadth of an agency's power to waive regulatory requirements or whether a rule authorizing waiver is always necessary." 137 *N.J.* at 60, 644 *A.2d* 558.

In any event, the DEP did not respond to our decision by adopting a waiver rule. When Gateway filed its application for a major modification, the DEP approved the request noting that our *SMB* decision did not require it to "reach back to disturb a waiver" previously granted. As it now stands, Gateway may construct its development without the intercept parking facility initially envisioned in the original CAFRA permit. Instead of the parking facility, Gateway will construct an outlet shopping center. Appellants, who objected to the major modification and were denied an adjudicatory hearing, appeal from the DEP's decision. We granted Pleasantville's motion to intervene.

## II.

Preliminarily, we address respondents' arguments that this appeal should be dismissed as untimely or, alternatively, as procedurally barred under the doctrines of laches, waiver and estoppel. We disagree.

Initially, we reject respondents' contention that this appeal is untimely. *R.* 2:4–1(b) provides "[a]ppeals from final decisions or actions of state administrative agencies or officers ... shall be taken within 45 days from the date of service of the decision or notice of the action taken." Under *R.* 2:4–4(a), the appellate court may extend this time for a period not exceeding thirty days "upon a showing of good cause and the absence of prejudice ... but only if the notice of appeal ... was in fact served and filed within the time as extended." This thirty-day extension cannot be enlarged. *In re Hill,* 241 *N.J.Super.* 367, 370, 575 *A.2d* 42 (App.Div.1990). Therefore, where an appeal is untimely, the Appellate Division has no jurisdiction to decide the merits. *Id.* at 372, 575 *A.2d* 42;

*Calcaterra v. Calcaterra,* 206 *N.J.Super.* 398, 402, 502 *A.*2d 1180 (App.Div.1986). Against this backdrop, respondents note that the DEP originally waived its bay island corridor policy in 1986 and issued the CAFRA permit in 1989. They assert that appellants were bound to appeal these intermediate determinations and that their failure to do so precludes them from challenging the waiver contained in the subsequently issued major modification.

Respondents' argument ignores the fact that a request for a major modification requires a new and separate review from that conducted on the initial permit application. The DEP's regulations in effect at the time it approved Gateway's major modification expressly distinguished between requests for major modifications and minor modifications. *See, e.g., N.J.A.C.* 7:7–1.5; *N.J.A.C.* 7:7–4.10 (subsequently amended July 18, 1994); 26 *N.J.R.* 2934(a), 2985–86 (July 18, 1994). Minor modifications were defined as those "which do not result in a significant change in the scale, design, use or impact of the project as approved." *N.J.A.C.* 7:7–4.10(b) (subsequently amended July 18, 1994). Requests for minor modifications were to be acted upon within thirty days and were to be "generally ... approved by the Division." *Ibid.; N.J.A.C.* 7:7–4.10(c) (subsequently amended July 18, 1994). In contrast, major modifications required "an amended permit application," *N.J.A.C.* 7:7–4.10(d)(1) (subsequently amended July 18, 1994), and mandated a higher level of review by the agency.

It is apparent that the DEP made two distinct decisions with regard to the bay island corridor policy, the first when it granted the initial permit, and the second when it decided to "grandparent" the waiver in the major modification. That this is the case is best evidenced by the DEP's letter to Gateway inviting it to seek a major modification on the ground that intercept parking was no longer to be encouraged. It will be recalled that the DEP warned Gateway it would "grandparent" its prior waiver of the bay island corridor policy only if the intercept parking facility were replaced with a different public benefit. Specifically, Gateway was told that the revised plan must "provide equal public

benefits in lieu of intercept parking, and thereby continue to justify the Division's non-application of the [b]ay [i]sland [p]olicy to the site." In this context, we view the DEP's decision to "grandparent" its initial waiver of the policy as a separate and distinct final administrative determination from which an appeal may be taken.

We also find no basis for applying the doctrines of laches, estoppel or waiver. "Laches is the neglect, for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done." *State v. Dopp*, 268 *N.J.Super.* 165, 176, 632 *A.*2d 1270 (App.Div. 1993) (citing *Lavin v. Hackensack Bd. of Educ.*, 90 *N.J.* 145, 151, 447 *A.*2d 516 (1982)). "Whether or not it is inequitable to allow a claim to be enforced will generally turn on whether an adverse party has been harmed by the delay." *Ibid.* (citing *Lavin v. Hackensack Bd. of Educ.*, 90 *N.J.* at 153, 447 *A.*2d 516). The party urging the application of laches has the burden of proof. *Allstate Ins. Co. v. Howard Sav. Inst.*, 127 *N.J.Super.* 479, 489, 317 *A.*2d 770 (Ch.Div.1974).

Equitable estoppel is "the effect of the voluntary conduct of a party whereby the party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed, as against another person, who has in good faith relied upon such conduct and has been led thereby to change his position for the worse." *State v. Dopp*, 268 *N.J.Super.* at 175–76, 632 *A.*2d 1270; *see also W.V. Pangborne & Co. v. New Jersey Dep't of Transp.*, 116 *N.J.* 543, 553, 562 *A.*2d 222 (1989).

Waiver is "the intentional relinquishment of a known right." *West Jersey Title & Guar. Co. v. Industrial Trust Co.*, 27 *N.J.* 144, 152, 141 *A.*2d 782 (1958). Waiver "implies an election by [a] party to dispense with something of value or to forego some advantage which that party might have demanded and insisted on." *Country Chevrolet, Inc. v. North Brunswick Tp. Planning Bd.*, 190 *N.J.Super.* 376, 380, 463 *A.*2d 960 (App.Div.1983). Thus, it must be shown that the party charged with the waiver knew of

his or her legal rights and deliberately intended to relinquish them. *Shebar v. Sanyo Business Sys. Corp.*, 111 *N.J.* 276, 291, 544 *A.*2d 377 (1988); *Petrillo v. Bachenberg*, 263 *N.J.Super.* 472, 480, 623 *A.*2d 272, (App.Div.1993), *aff'd on other grounds*, 139 *N.J.* 472, 655 *A.*2d 1354 (1995). Waiver must, therefore, be evidenced by a clear, unequivocal and decisive act from which an intention to relinquish the right can be inferred. *Country Chevrolet, Inc. v. North Brunswick Tp. Planning Bd.*, 190 *N.J.Super.* at 380, 463 *A.*2d 960. "It must be supported by either an agreement with adequate consideration, or by such conduct as to estop the waiving party from denying the intent to waive." *Petrillo v. Bachenberg*, 263 *N.J.Super.* at 480, 623 *A.*2d 272; *accord West Jersey Title & Guar. Co. v. Industrial Trust Co.*, 27 *N.J.* at 152–53, 141 *A.*2d 782.

■ However phrased, we discern nothing wrongful in appellants' initial inaction when the original CAFRA permit was granted and in its later decision to appeal the DEP's grant of the major modification. An objector to the original permit could reasonably have concluded that the development, as approved, had some redeeming environmental value because it would have alleviated the severe traffic congestion problems that indisputably existed at the time. The subsequent modification eliminated this public interest component in favor of an intensive retail use. It cannot fairly be said that the objectors "engaged in a classic case of sandbagging, biding their time and preserving their arguments until the eleventh hour." *SMB Associates v. New Jersey Dep't of Envtl. Prot.*, 137 *N.J.* at 67, 644 *A.*2d 558 (Garibaldi, J., dissenting). The simple and overriding fact is that the proposed development approved in the major modification was not the same type of development authorized in the original CAFRA permit. Appellants had the right to challenge the major modification by seeking appellate review notwithstanding their decision to refrain from taking this course with respect to the original CAFRA permit.

## III.

We next address the substantive issues presented. As we noted earlier, the Supreme Court affirmed the result we reached in

*SMB* without deciding whether an agency could waive its regulatory requirements in the absence of a rule authorizing waiver. 137 *N.J.* at 60, 644 *A.*2d 558. While we recognize there is no catechism mandating that administrative action only be taken by way of rulemaking, *State v. Stavola,* 103 *N.J.* 425, 442–43, 511 *A.*2d 622 (1986), we adhere to our decision in *SMB* that establishment of substantive and procedural standards governing the exercise of waiver authority is critical to the exercise of that power in the public interest.

In effectuating CAFRA policy, the DEP has itself recognized the importance of proceeding with the utmost care, caution and clarity. *Crema v. New Jersey Dep't of Envtl. Prot.,* 94 *N.J.* 286, 301, 463 *A.*2d 910 (1983). In the context of its bay island corridor policy, it has disciplined its own discretion by promulgating a comprehensive set of regulations designed to assure the greatest possible degree of predictability in its own actions. *Cf. ibid.* This is salutary because " 'administrative officers [should] articulate the standards and principles that govern their discretionary .decisions in as much detail as possible.' " *Ibid.* (quoting *Environmental Defense Fund, Inc. v. Ruckelshaus,* 439 *F.*2d 584, 598 (D.C.Cir. 1971)). It is equally plain that the DEP's power to waive or suspend its regulatory requirements should be similarly circumscribed by a rule establishing standards to guide the agency in determining whether an exemption is warranted in a particular case.

The determination whether to waive the DEP's bay island corridor policy in a given case will substantially impact a considerable amount of environmentally sensitive and unique coastal land with continuing widespread effects upon the public. Other than the general legislative findings articulated in *N.J.S.A.* 13:19–2, the statutory scheme is silent on the subject. Absent a regulation governing waiver, the public and any affected or interested parties are without firm knowledge of the factors that might influence the DEP's ultimate decision. Moreover, without promulgation of a regulation, the public has no meaningful opportunity to shape the

regulatory criteria that ultimately will affect its interests. *Crema v. New Jersey Dep't of Envtl. Prot.,* 94 *N.J.* at 302, 463 *A.*2d 910. The absence of standards could encourage arbitrary action on the part of the DEP, thus causing the agency's reputation and standing in public opinion to decline.

■ Of course, the question of whether administrative action must be conducted by rulemaking or adjudication has spawned substantial litigation. *See, e.g., Woodland Private Study Group v. State,* 109 *N.J.* 62, 67, 533 *A.*2d 387 (1987); *In re Request for Solid Waste Util. Customer Lists,* 106 *N.J.* 508, 517–18, 524 *A.*2d 386 (1987); *Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 328–31, 478 *A.*2d 742 (1984); *Crema v. New Jersey Dep't of Envtl. Prot.,* 94 *N.J.* 286, 463 *A.*2d 910; *Texter v. Department of Human Servs.,* 88 *N.J.* 376, 383–86, 443 *A.*2d 178 (1982); *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n,* 85 *N.J.* 325, 426 *A.*2d 1000, *app. dism.,* 454 *U.S.* 804, 102 *S.Ct.* 77, 70 *L.Ed.*2d 74 (1981); *Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138, 183 *A.*2d 64 (1962); *Terminal Constr. Corp. v. Hoboken–Union City–Weehawken Sewerage Auth.,* 244 *N.J.Super.* 537, 550, 582 *A.*2d 1288 (App.Div.1990), *certif. denied,* 126 *N.J.* 323, 598 *A.*2d 883 (1991); *American Cyanamid Co. v. State,* 231 *N.J.Super.* 292, 305, 555 *A.*2d 684 (App.Div.), *certif. denied,* 117 *N.J.* 89, 563 *A.*2d 847 (1989); *Radiological Soc'y v. New Jersey Dep't of Health,* 208 *N.J.Super.* 548, 558–60, 506 *A.*2d 755 (App.Div.), *certif. denied,* 104 *N.J.* 444, 517 *A.*2d 434 (1986). Several of our decisions on the subject appear somewhat inconsistent, and the conclusions reached rest largely on the specific area of regulatory activity involved. Although exemptions from complex regulatory schemes pose vexing questions, we are satisfied that the DEP cannot waive its bay island corridor policy in the absence of an administrative regulation authorizing such a waiver and setting forth substantive standards to guide the agency's exercise of waiver authority.

■ We rendered our decision in *SMB* on April 23, 1993, some five months before the hearings were conducted on Gateway's application to alter its CAFRA permit, and some seven months

before the DEP granted the major modification. We agree with the DEP that it was not incumbent upon that agency to vacate all waivers of the bay island corridor policy that had been granted prior to the date our decision in *SMB* was rendered. We reiterate, however, that the DEP's decision to "grandparent" its prior waiver of the policy when it approved Gateway's request for a major modification of its CAFRA permit constituted a separate and distinct administrative determination. By the time the major modification was granted, the DEP was on notice that it did not have the authority to waive the bay island corridor policy without the promulgation of a regulation granting and defining that authority. Even assuming, as Gateway contends, that it had a "vested right" in the original waiver, Gateway could not insist upon continued suspension of the policy while seeking a major modification of its project that eliminated the public interest component upon which the initial exemption had been predicated. The DEP did not have the authority to perpetuate the irregular exercise of its waiver power.

## IV.

In the course of our research, we came across *N.J.A.C.* 7:7–1.9 (subsequently amended and readopted as *N.J.A.C.* 7:7–1.10 on July 18, 1994), which was in effect at the time Gateway's application for a major modification was granted. The regulation provided:

> [t]his chapter shall be liberally construed to effectuate the purpose of the Acts under which it was adopted. The Division may, in its discretion, relax their application when necessary and in the public interest.
>
> [*Ibid.*]

*N.J.A.C.* 7:7–1.9 was adopted in 1984, *see* 16 *N.J.R.* 1073(a), 1075 (May 7, 1984), and was applicable to applications filed under CAFRA, the Waterfront Development Law (*N.J.S.A.* 12:5–1 to – 11), and the Wetlands Act of 1970 (*N.J.S.A.* 13:9A–1 to –10). *See N.J.A.C.* 7:7–1.1 (adopted May 7, 1984, subsequently amended July 18, 1994). Apparently, this regulation was not cited by any of

the parties in *SMB* and was not considered by either this court or the Supreme Court in the decisions rendered. We asked the parties in this case to brief and argue the question whether *N.J.A.C.* 7:7–1.9 is applicable to the DEP's approval of Gateway's application for a major modification of its CAFRA permit and, if so, whether it contains sufficient standards to guide administrative exercise of the waiver authority conferred. We now examine those issues.

Our traditional role in resolving questions relating to the validity of administrative regulations "is highly circumscribed." *Lower Main Street Assocs. v. New Jersey Housing & Mortg. Fin. Agency,* 114 *N.J.* 226, 236, 553 *A.*2d 798 (1989). It is elementary that coordinate branches of government should not encroach upon each other's responsibilities. We thus defer to agency action that is consistent with the legislative grant of power to the agency. *Ibid.; see also A.A. Mastrangelo, Inc. v. Commissioner of the Dep't of Envtl. Prot.,* 90 *N.J.* 666, 687, 449 *A.*2d 516 (1982); *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 562, 384 *A.*2d 795 (1978). However, "deference does not require abdication by the judiciary of its function to assure that agency rulemaking conforms with basic tenets of due process, and provides standards to guide both the regulator and the regulated." *Lower Main Street Assocs. v. New Jersey Housing & Mortg. Fin. Agency,* 114 *N.J.* at 236, 553 *A.*2d 798. We conclude that *N.J.A.C.* 7:7–1.9 does not satisfy the requirements of our decision in *SMB.*

There are several reasons for this conclusion. First, we are thoroughly convinced that *N.J.A.C.* 7:7–1.9 authorizes only the waiver of procedural rules. The regulation is just one of many administrative rules incorporated into Chapter 7 and collectively entitled "Coastal Permit Program Rules." These are distinct and separate from the more substantive administrative regulations found in Chapter 7:7E, which are collectively referred to as the "Rules on Coastal Zone Management." It is Chapter 7E that incorporates the bay island corridor policy at *N.J.A.C.* 7:7E–3.21.

The difference between Chapter 7 and Chapter 7E is significant and is demonstrated by the introductory language of each of these chapters. According to this language, the purpose of Chapter 7 is as follows:

> *This chapter establishes the procedures* by which the Department of Environmental Protection will review permit applications and appeals from permit decisions (including appeals to the Coastal Area Review Board) under the Coastal Area Facility Review Act (CAFRA, *N.J.S.A.* 13:19–1 *et seq.*), the Wetlands Act (*N.J.S.A.* 13:9A–1 *et seq.*) and the Waterfront Development Law (*N.J.S.A.* 12:5–3).
>
> [*N.J.A.C.* 7:7–1.1(a) (subsequently amended July 18, 1994) (emphasis added).]

By contrast, the purpose of Chapter 7E is stated as follows:

> *This chapter presents the substantive rules* of the Department of Environmental Protection regarding the use and development of coastal resources, to be used primarily by the Land Use Regulation Program in the Department in reviewing permit applications under the Coastal Area Facility Review Act (CAFRA), *N.J.S.A.* 13:19–1 *et seq.* (as amended to July 19, 1993), Wetlands Act of 1970, *N.J.S.A.* 13:9A–1 *et seq.*, [and] Waterfront Development Law, *N.J.S.A.* 12:5–3 . . . .
>
> [*N.J.A.C.* 7:7E–1.1(a) (emphasis added).]

It is thus clear that Chapter 7 contains the procedural rules to be utilized by the DEP in evaluating CAFRA permit applications, whereas Chapter 7E contains the substantive rules DEP must apply to the same applications. We add for the sake of completeness that the DEP has conceded this point both in its brief and during oral argument. We assume that *N.J.A.C.* 7:7–1.9 was not cited to either this court or our Supreme Court in *SMB* precisely because the regulation was intended to apply only to procedural rules and not to substantive requirements. In any event, subsequent actions by the DEP prove beyond peradventure that the agency has always regarded *N.J.A.C.* 7:7–1.9 as being confined to relaxation of procedural regulations. The regulation was amended and recodified in 1994 to make that limitation explicit. 26 *N.J.R.* 2934(a), 2977 (July 18, 1994). It now reads:

> This chapter shall be liberally [construed] to effectuate the purpose of the Acts under which it was adopted. The Department may, in its discretion and if consistent with statutory requirements, relax the application of any of the procedures contained in this chapter when necessary and in the public interest.
>
> [*N.J.A.C.* 7:7–1.10.]

■ Second, the administrative history of *N.J.A.C.* 7:7–1.9 discloses that it has never been applied by the DEP to waive the substantive requirements of the bay island corridor policy. During the process of the DEP's readoption of its coastal regulations in September 1990, the following exchange occurred in the summary of public comments and agency responses:

> COMMENT: The Department has the authority to waive coastal policies and should allow waivers in cases where a project ought to be approved in a different form than what is required by the land use policies.
>
> RESPONSE: The Coastal Zone Management Rules represent the consideration of various conflicting, competing, and contradictory local, State, and national interests in diverse coastal resources and in diverse uses in diverse coastal locations. Numerous balances have been struck among these interests in defining these policies.... Rules cannot be waived or ignored. If a rule is found to be unreasonable, the Department will seek to amend the rule through the public rulemaking process and not through individual permit decision making.
>
> [22 *N.J.R.* 2542(b), 2543 (Aug. 20, 1990).]

We are obliged to accord deference to the DEP's long usage, contemporaneous construction and practical interpretation in applying its own regulations. *Cf. Service Armament Co. v. Hyland,* 70 *N.J.* 550, 561, 362 *A.*2d 13 (1976); *Pringle v. New Jersey Dep't of Civil Serv.,* 45 *N.J.* 329, 332–33, 212 *A.*2d 360 (1965); *State v. Clark,* 15 *N.J.* 334, 341, 104 *A.*2d 685 (1954).

Third, *N.J.A.C.* 7:7–1.9 did not contain sufficient standards to guide the DEP in the exercise of its waiver authority. While a statutory reference to the "public interest" has been regarded as sufficiently precise to guide an administrative agency in implementing a legislative policy, *see Keyes Martin & Co. v. Director, Div. of Purchase and Property,* 99 *N.J.* 244, 262, 491 *A.*2d 1236 (1985); *Elizabeth Fed. Sav. & Loan Ass'n v. Howell,* 30 *N.J.* 190, 194, 152 *A.*2d 359 (1959), we deem it far too nebulous and broad a concept to provide a structural framework for the exercise of an agency's waiver power. In reaching this conclusion, we point to the DEP's regulations providing standards for waivers in other contexts. *See, e.g., N.J.A.C.* 7:7A–7.2 (waiver of freshwater wetlands transition area rules); *N.J.A.C.* 7:13–4.8 (waiver of stream encroachment permit rules); *N.J.A.C.* 7:26B–10.1 (*de minimus* quantity exemption from environmental cleanup responsibility

rules); *N.J.A.C.* 7:50–4.63 (waiver of strict compliance with Pine-lands Comprehensive Management Plan due to extraordinary hardship). These detailed rules quite literally spell out the circumstances under which the DEP will deem application of its regulatory requirements too onerous, thereby requiring their waiver or suspension. *See In re Adoption of N.J.A.C. 7:26B,* 250 *N.J.Super.* 189, 225–29, 593 *A.*2d 1193 (App.Div.1991), *aff'd in part, rev'd in part,* 128 *N.J.* 442, 608 *A.*2d 288 (1992).

Finally, we do not perceive our mandate too onerous for the agency to bear. We merely require the DEP to articulate more definitive standards for the sound exercise of its discretion. The history of the DEP's waiver policies concerning the value of intercept parking presents stark evidence of the need for the creation and reasoned application of such standards.

We are nonetheless sensitive to the plight of the developer, who has been buffeted by the twists and turns in the DEP's requirements. We also understand the DEP's attempt to insulate Gateway from the harm that these changes in policy have wrought. All this conceded, our overriding concern is to ensure that government officials operate under uniform, clearly articulated rules.

Accordingly, the DEP's approval of Gateway's application for modification of its CAFRA permit is reversed. The matter is remanded to the DEP for further proceedings consistent with this opinion. We do not retain jurisdiction.