704 A.2d 1261

IN RE CAFRA PERMIT NO. 87–0959–5 ISSUED
TO GATEWAY ASSOCIATES.

Argued September 8, 1997—Decided December 31, 1997.

288

*Jack Plackter* argued the cause for appellant Gateway Associates (*Horn, Goldberg, Gorny, Daniels, Plackter, Weiss & Casiello*, attorneys; *Sally E. Heckeroth*, on the brief).

*Rachel J. Horowitz*, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (*Peter Verniero*, Attorney General, attorney; *Lewin Weyl*, Deputy Attorney General on the brief).

*Gordon N. Litwin* argued the cause for respondent American Littoral Society (*Ansell Zaro Grimm & Aaron*, attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

The basic issue is whether respondent, the American Littoral Society (ALS), is time-barred from appealing the grant of a permit issued by the Department of Environmental Protection (DEP) to develop a site in the coastal zone near Atlantic City. After initially approving a permit in 1989, the DEP modified the permit in 1993. We hold that the ALS is time-barred from pursuing this appeal.

The DEP concluded in 1986 that its recently enacted Bay Island Corridor Policy (the Policy) did not apply to a project proposed by Boardwalk Associates, Inc. (Boardwalk), a predecessor of appellant, Gateway Associates (Gateway). In 1989, the DEP issued to Gateway a development permit under the Coastal Area Facilities Review Act (CAFRA), *N.J.S.A.* 13:19–1 to –21.

Although the ALS opposed the application, it did not appeal from the issuance of the permit. Four years later, at the DEP's request, Gateway applied for a modification to the permit. The DEP approved the modification. On the ALS's appeal, the Appellate Division reversed the grant of the modified permit. The court held that the appeal was timely and that the DEP lacked authority to waive the Policy. 290 *N.J.Super.* 498, 676 *A.*2d 161 (1996).

We granted certification, 147 *N.J.* 260, 686 *A.*2d 761 (1997)and now reverse the judgment of the Appellate Division.

I.

In 1984, Boardwalk entered into an agreement with the City of Pleasantville for the acquisition and development of a 475 acre tract abutting the Atlantic City Expressway between Pleasantville and Atlantic City. The tract, a former dredge-disposal site, was zoned for multi-use commercial activities and public facilities.

Because the site was in the coastal zone, the project required a CAFRA permit. Throughout 1984 and 1985, Boardwalk met with representatives of the DEP's Division of Coastal Resources (the Division) to discuss the development of the project. The DEP encouraged Boardwalk to provide for "intercept-parking" for casino patrons and employees as a means of reducing air pollution and traffic congestion around Atlantic City.

Boardwalk originally proposed a mixed-commercial development on approximately 100 acres, including: (1) fourteen major non-casino hotels containing 4013 rooms; (2) a day-care center and other commercial facilities, including office and retail space; (3) a 115–acre wetlands mitigation site; and (4) a combination busing and public intercept parking facility.

On July 31, 1984, John Weingart, the Director of the Division, wrote a letter to Gateway stating that the project must address five conditions. The conditions included the ecological value of the project, its impact on redevelopment in Atlantic City, the positive

impact of major bus parking, and the feasibility of intercept parking.

Nine months later, Boardwalk acquired the property and subsequently transferred it to Gateway Associates, a joint venture between Boardwalk and Hill International, a management consulting firm. To facilitate development of the project, Gateway entered into a number of agreements with the DEP, Pleasantville, a consulting firm, and the Atlantic County Transportation Authority. Gateway also surveyed the tract, inventoried the existing environmental conditions, and completed environmental impact studies. According to Gateway, by December 1988 its expenses for these preliminary activities totaled $4 million.

On February 4, 1986, Weingart sent to Gateway a letter in which he concluded "based on the materials submitted today, we are likely to be able to approve a CAFRA permit for the ACTA bus parking facility and privately developed hotels on the non-wetlands part of the site." The letter cautioned, "Please understand that in accordance with *N.J.A.C.* 7:7–3.5(c) this guidance is not a binding commitment by the Division to approve or deny any forthcoming coastal permit application for this site."

Significantly, in February 1986, the DEP also adopted the Policy. *N.J.A.C.* 7:7E–3.24 (subsequently recodified at *N.J.A.C.* 7:7E–3.21); *see N.J.R.* 2990(a), 3046–47 (July 18, 1994). The Policy is one of several regulations promulgated under CAFRA, *N.J.S.A.* 13:19–1 to –21, which sets standards for economic development in coastal areas. *See N.J.S.A.* 13:19–2 (setting forth legislative findings concerning CAFRA), 13:19–5 (prohibiting construction in coastal area without permit), 13:19–6 (requiring persons proposing construction in coastal zone to file permit application).

Under CAFRA, the DEP may "adopt, amend and repeal rules and regulations to effectuate the purposes" of the Act. *N.J.S.A.* 13:19–17. Accordingly, the DEP enacted Chapter 7E of the Administrative Code, which embodied the Policy, to set forth the substantive rules regarding the development of coastal resources.

*N.J.A.C.* 7:7E–1.1. The regulations target specific areas within the coastal zone, including Bay Island Corridors. *See N.J.A.C.* 7:7E–3.1 to –3.48 (describing "special areas" under CAFRA). In 1986, the regulations defined Bay Island Corridors as "non-oceanfront islands surrounded by tidal waters," *N.J.A.C.* 7:7E–3.24(a)(2), consisting of "that portion lying upland of wetlands and beach but including the filled water's edge." *N.J.A.C.* 7:7E–3.24(a)(3).

The Policy did not prohibit all development on Bay Island Corridors. Instead, it stated:

[W]ater dependent development is discouraged on bay island corridors which do not abut a paved public road and [are] not served by a sewerage system with adequate capacity.

On Bay Island Corridors which abut a paved public road and sewerage system with adequate capacity, water dependent development is acceptable, and all other development is acceptable only at a low intensity (defined as 3% to 5% of the upland portion of the bay island).

[*N.J.A.C.* 7:E–3.24(d).]

Application of the Policy would not prohibit Gateway's project, but would limit development to three to five percent of the property. If the Policy does not apply, Gateway could develop approximately twenty percent of the site.

Gateway continued to pursue its project. One early phase involved the "dedelineation" of tidal wetlands as uplands. On June 11, 1986, DEP held a public hearing on Gateway's proposal to dedelineate approximately ninety-six acres. At the hearing, D.W. Bennett, the Executive Director of the ALS, asked a number of questions, but did not mention the Policy. After the hearing, the DEP amended the coastal wetlands map and approved the proposed classification of the property as uplands.

At some point, a question arose concerning the applicability of the Policy to the site. On October 21, 1986, Gateway wrote to the DEP asserting that the site was neither an ocean-front island nor surrounded by tidal waters. On November 20, 1986, Weingart sent a letter to Gateway stating that the DEP would not apply the Policy to the development:

I have concluded that the Division will not apply the Island Corridor Policy to this site of the combination bus-parking facility, intercept parking facility and hotel and commercial operation you have discussed with us. Although the policy took effect February 3, 1986 and you have not yet submitted a permit application for this site, you did initiate and successfully pursue a formal dedelineation of wetlands on the site while the policy was under public review and we never informed you that it might apply to your site. In addition, as Director of the Division, I outlined the criteria we would use to review the project in a letter I sent you July 31, 1984 and, again since we continued to regularly discuss the project and, again since we failed to notify you that the pending policy change could affect the terms of that letter, I feel it is only fair to you to not require you meet the Island Corridor Policy.

> . . . . . . . .

Since writing that letter in July 1984, DEP has concluded that a large part of the site then classified as Wetlands is not wetlands and is no longer subject to the Wetlands Act of 1970, and, as reflected in this letter, the combination bus-parking facility, intercept parking facility and hotel and commercial operation would not be subject to Island Corridor Policy.

> . . . . . . . .

I do not agree, however, with your conclusions regarding the general applicability of the Island Corridor Policy to this site. Were it not for this administrative history, I would have concluded that the project had to comply with the Island Corridor Policy as well as all other Coastal Policies. Also, if the current proposal does not reach reality and a different type of development is proposed for the site, I believe the Island Corridor Policy would apply.

Weingart indicated that apart from considerations of fairness, the Policy would apply because the site was surrounded by "tide flowed" water, mosquito ditches, and wetlands, which were considered tidal waters. Although Gateway continued to assert that the Policy did not apply, it decided not to litigate the issue because of Weingart's decision not to require Gateway to meet the Policy's requirements.

On at least two other occasions, the DEP's application of the Policy has been subject to judicial review. In 1988, the DEP declined to apply the Policy to a project proposed on Osborn Island in Little Egg Harbor. Although the project met the Policy's literal definition of a Bay Island Corridor, Osborn Island was not a former wetlands site. Consequently, the DEP decided not to apply the Policy to the site. In an unreported decision, the Appellate Division affirmed the DEP's decision. *Osborn Island*

*Residents Assocs., Inc. v. Department of Envtl. Protection,* A–2356–89T2 (App.Div. July 11, 1991).

In another case, however, the DEP refused to waive the Policy for a project known as Anchoring Point, a mixed use development in Atlantic City. *SMB Assocs. v. Department of Envtl. Protection,* 264 *N.J.Super.* 38, 624 *A.*2d 14 (App.Div.1993), *aff'd,* 137 *N.J.* 58, 644 *A.*2d 558 (1994). The DEP distinguished Gateway's project: "The proposed Gateway project ... differed from the proposed Anchoring Point project in that the Gateway Project contains substantial public interest components. The proposed 4000 space intercept parking area and transportation center are essential to the State's transportation planning for the Atlantic City region." Over the DEP's objection, the then-existing Coastal Area Review Board (CARB) granted a waiver of the Policy. On the ALS's appeal, the Appellate Division reversed. The Appellate Division held that the CARB's waiver of the Policy effected "a nullification of important policy determinations expressed in DEP regulations implementing CAFRA" and "neither [the CARB] nor the Commissioner had the authority to grant such a waiver in the absence of a regulation adopted pursuant to the Administrative Procedure Act authorizing waivers and establishing appropriate standards of the exercise of waiver authority." *SMB Assocs., supra,* 264 *N.J.Super.* at 50, 624 *A.*2d 14. This Court affirmed on other grounds without reaching the issue whether DEP could waive its regulations in the absence of a rule authorizing waiver. 137 *N.J.* 58, 60, 644 *A.*2d 558 (1994).

On October 7, 1987, Gateway submitted its application for a CAFRA permit. At the first public hearing, Gateway explained its proposal to develop 96 acres of uplands on the 475–acre site. Numerous people, including State and Atlantic County officials, spoke in favor of the project. The tenor of their statements was that the project would create jobs and tax revenues, provide the Atlantic City area with needed non-casino hotel rooms, and reduce pollution.

At that time, the ALS became actively involved in opposing the project. The ALS wrote on August 16, 1988 to Christopher Daggett, the newly-appointed DEP Commissioner, requesting application of the Policy to the project and questioning the alleged benefits of intercept parking. In an August 18, 1988 letter to the DEP, the ALS outlined its objection to the intercept parking facility:

> We don't think the magnitude of the public transportation component of this project delivers many benefits, certainly not, under the most optimistic outcome, enough to overcome the logic contained in the Island Corridor Policy.... To us, it sounds as if the public parking component is a small concession to the public need aspect of the whole Gateway project. The positive trade-offs don't outweigh the public negatives contained in this project.

At the second public hearing, William Neil, the New Jersey Coordinator for the ALS, testified in opposition to the project. He urged that the Policy should apply. In response to the DEP's request that the project contain more intercept parking, Gateway amended its plans to increase the number of parking spaces from 1500 to 4,000 and to decrease other parts of the project.

On October 18, 1989, after a third public hearing, the DEP approved Gateway's application for a CAFRA permit covering: (1) 4000 parking spaces; (2) eight hotels; (3) 40,000 square feet of day care and other commercial facilities; (4) a twenty-acre dredge spoil site; (5) a 115–acre wetlands mitigation bank; and (6) a 205–acre wildlife management area. The DEP required Gateway to comply with seventeen separate conditions, including the construction of all 4000 parking spaces, before the commencement of hotel construction. In granting the permit, the DEP noted that Gateway's provision for intercept parking satisfied the Division's public interest concerns. Although the DEP provided the ALS with a copy of the permit, the ALS did not appeal.

In 1990, one year after approving Gateway's permit, the DEP adopted a rule requiring casinos to provide intercept parking facilities for employees. The purpose of the rule was to improve air quality and reduce traffic congestion in Atlantic City. *N.J.A.C.* 7:7E–7.5(d) (Transportation Use Policies); 22 *N.J.R.* 1188(a), 1210

(April 16, 1990); 22 *N.J.R.* 2542(b), 2567 (August 20, 1990). The rule was consistent with the requirement for parking in Gateway's permit and with the DEP's insistence that Gateway complete construction of the intercept parking before starting hotel construction.

Gateway, however, encountered difficulty in negotiating commitments with the casinos for parking in the proposed intercept lot. Notwithstanding the casinos' opposition to intercept parking, Weingart wrote to Gateway reminding it not to begin construction on other parts of the project before completing the parking spaces.

Then, in 1991, the DEP changed its position and abandoned its rule mandating the inclusion of casino intercept parking. Thereafter, the DEP adopted a rule allowing Atlantic City casinos to use alternative means to reduce vehicular traffic in Atlantic City. *N.J.A.C.* 7:7E–7.5(d); 25 *N.J.R.* 1549(b), 1551–52 (April 5, 1993). The change posed a dilemma for Gateway. The 4000 space intercept parking lot was no longer needed, but the requirement for the parking remained a condition to the 1989 CAFRA permit.

To solve the dilemma, on May 23, 1991, the DEP invited Gateway to submit a proposal to modify the existing permit or to apply for a new CAFRA permit "which would provide equal public benefits in lieu of intercept parking, and thereby continue to justify the Division's non-application of the Bay Island policy to the site."

Rather than apply for a new CAFRA permit, Gateway chose to submit a "lesser-impact major modification" to the October 1989 permit. Gateway made this choice pursuant to *N.J.A.C.* 7:7–4.10, which allowed a permittee to apply for a modification to an issued permit. Accordingly, Gateway replaced 40,000 square feet of commercial space and the 4000 intercept parking spaces with a 408,600 square foot fashion outlet shopping center and 2277 parking spaces. The balance of the proposed project remained unchanged.

On January 3, 1992, Weingart wrote to Gateway stating that the DEP would evaluate only the proposed changes in the project and that it would not "reevaluate issues resolved during their review of the original permit application." Specifically, Weingart stated:

One significant issue is whether an application for permit modification would be subject to the Bay Island Corridor Policy. I have concluded that the application would continue to be grandparented from this policy for the same reasons that were articulated in my November 20, 1986 letter....

Weingart indicated that the DEP would conduct a public hearing on the modification, but "given the extensive analysis we have already performed on this site for the initial application, I expect that the review process will be relatively short."

At the public hearing on September 10, 1993, the ALS objected to the elimination of the public interest component of the project. On November 9, 1993, the DEP approved Gateway's application for a permit modification. In the approval, Weingart noted:

I agreed that the Department would continue to waive the Bay Island Corridor Policy for the permit modification. The prior policy had been waived in the initial CAFRA permit decision because the Department's formal review of the development was already underway when the policy was adopted. The modification to the permit is necessary because of a change in State policy concerning the mandated casino intercept parking policy.... Both these letters were based in brief, on a finding that the initial application had been designed, in part, to help fulfill a State policy goal and since the State has changed that policy, the review of the developer's modification request should in fairness be subject to the rules and requirements in effect at the time of the initial review.

The DEP also identified the following public benefits to the project: (1) the 120–acre wetlands mitigation bank; (2) the dredge spoils disposal site; (3) the luxury tax on hotel rooms paid to Atlantic City; and (4) the 205–acre wildlife management area. Additionally, the DEP indicated that the decreased number of parking spaces and the increased acreage of the wetlands buffer reduced the environmental impact of the project.

On November 18, 1993, the ALS requested an administrative hearing to contest the DEP's approval of the permit modification and a stay of the issuance of the permit. Although the ALS recognized that seven years had passed since the DEP's decision to waive the Policy, the ALS nonetheless challenged the waiver.

On February 16, 1994, the DEP denied ALS's request for a hearing on its appeal. Referring to the Appellate Division's decision in *SMB Associates*, the DEP explained:

> The Department does not read the *SMB* decision as requiring it to reach back to disturb a waiver first granted, and then continued, so long ago especially given the unique predicament that Gateway finds itself where a long planned project was frustrated due to a unilateral change in State transportation policies.

On the ALS's appeal, the Appellate Division reversed the DEP's approval of Gateway's application for modification of its CAFRA permit. 290 *N.J.Super.* at 518, 676 *A*.2d 161. First, the court rejected the argument that the appeal was untimely. *Id.* at 508, 676 *A*.2d 161. It reasoned that the DEP had made two distinct decisions concerning the Policy, one when it granted the initial permit and another when it decided to "grandparent" the waiver in the major modification. *Id.* at 509, 676 *A*.2d 161. According to the court, the DEP's decision to grandparent its initial waiver was a separate and distinct final administrative action from which the ALS had timely appealed. *Id.* at 510, 676 *A*.2d 161.

The Appellate Division further held that the doctrines of laches, estoppel, and waiver did not bar ALS's action. *Id.* at 511, 676 *A*.2d 161. The court stated that the proposed development as approved in the major modification differed from the development as authorized in the original CAFRA permit. As the Appellate Division viewed the matter, the ALS's decision to refrain from appealing the original permit decision did not present a " 'classic case of sandbagging.' " *Ibid.* (citing *SMB Assocs., supra,* 137 *N.J.* at 67, 644 *A*.2d 558 (Garibaldi, J., dissenting)).

Relying on *SMB Associates*, the Appellate Division concluded that an administrative agency may not waive its substantive policy absent adoption of a regulation authorizing waiver. *Id.* at 512, 676 *A*.2d 161. Finally, the Appellate Division deemed inapplicable *N.J.A.C.* 7:7–1.9, which authorizes the DEP to relax the application of its regulations "when necessary and in the public interest." *Id.* at 515, 676 *A*.2d 161.

## II.

The critical issue is whether the ALS's appeal is timely. That issue is controlled by the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to –15, the Rules of Court, and fundamental rules pertaining to judicial review of action by state administrative agencies. Under the APA, when a statute or regulation provides for an internal appeal within an agency, "judicial review shall be from the final action of the agency." *N.J.S.A.* 52:14B–12. In this case, CAFRA regulations allow an aggrieved party to request a hearing before the DEP Commissioner within ten days of publication of the final decision. Additionally, the Rules of Court provide that an appeal from a final decision of a state agency, such as the DEP, "shall be taken within 45 days from the date of service of the decision or notice of the action." *R.* 2:4–1(b).

To satisfy Rule 2:4–1(b), an agency decision should contain adequate factual and legal conclusions. The decision also should give unmistakable notice of its finality. *DeNike v. Board of Trustees, Employees Retirement Sys. of N.J.*, 34 *N.J.* 430, 435, 170 *A.*2d 12 (1961); *see also Szczepanik v. Department of Treasury*, 232 *N.J.Super.* 491, 498–500, 557 *A.*2d 705 (1989) (holding that finality of decision not established with prior determinations that lacked findings of fact). Although not mandatory, the notice also should describe briefly the right to an appeal within the agency and the time limits for filing such an appeal. *DeNike, supra*, 34 *N.J.* at 435, 170 *A.*2d 12.

### A. 1986 Waiver Decision

Over eleven years ago, the DEP waived the application of the Policy to Gateway's site. In his November 20, 1986 letter, Director Weingart concluded that application of the Policy to Gateway's proposal would be unfair. Weingart reasoned that the DEP, without informing Gateway that it was about to propose changes in use restrictions pertaining to Gateway's site, had

encouraged Gateway to proceed. So encouraged, Gateway took affirmative steps at considerable expense to develop the site.

Although the November 20 letter does not mention the requirement for intercept parking, subsequent correspondence reveals that the DEP considered Gateway's agreement to provide such parking as further justification for waiving the Policy. Apparently the DEP believed that intercept parking, by reducing traffic congestion and air pollution around Atlantic City, would serve the public interest. Thus, Weingart's February 4, 1988 letter to Gateway suggested that "the exemption from the policy remains predicated upon the Division's determination that the proposed public transportation component satisfies the original intent of the exemption." From the foregoing, we conclude that the DEP justified its decision to waive the Policy both because application of the Policy to Gateway's project would be unfair and because Gateway had agreed to provide intercept parking.

The DEP and Gateway contend that Weingart's 1986 letter constituted a final agency determination. They assert that if the ALS had challenged the waiver of the Policy in 1986, Gateway could have sought a resolution before proceeding with its development. For our purposes, however, it suffices to note that the ALS could have appealed the waiver after November 1986.

Although the record does not reflect when the ALS first learned of the DEP's waiver decision, the ALS opposed the decision as early as August 1988, when it wrote to Commissioner Daggett requesting a reversal of that decision. At any time after becoming aware of the decision, ALS could have requested a final declaratory ruling regarding the applicability of the Policy. *N.J.S.A.* 52:14B–8. Nevertheless, the ALS failed for seven years to seek any relief from the DEP's 1986 waiver decision.

B. 1989 Permit Decision

Even if the ALS's failure to seek relief of the waiver decision under *N.J.S.A.* 52:14B–8 is excusable, its failure to appeal the issuance of Gateway's original CAFRA permit in 1989 is not. The

DEP incorporated the waiver in the permit. That permit was a final agency decision. In its decision, the DEP approved the issuance of a permit and, subject to seventeen conditions, authorized Gateway to commence construction. Because the permit allowed construction to begin, the DEP decided that it would not enforce the Policy against Gateway's project. Accompanying the decision was a thirty-one page decision summary outlining the DEP's findings of fact. The permit decision notified aggrieved parties of their right to appeal. That decision also informed any such parties of the time within which they must appeal. Within two days of the permit's issuance, the DEP forwarded a copy of the permit to the ALS.

Consequently, the October 1989 permit and summary provided ALS with "unmistakable written notice of the finality" of DEP's decision. The ALS, however, failed to request a hearing or a stay of the issuance of the permit. *See N.J.A.C.* 7:7–5.1(a) and (d) (providing for requests for hearings and stays of issuance of permits within ten days of notice of permit decision). Nor did the ALS request a hearing before the then-existing CARB, to which appeals could be taken from Division decisions, to review the DEP's decision. *See N.J.A.C.* 7:7–5.1(b) and (b)(1) (providing for direct appeals of policy decisions with CARB; providing also for CARB review of Commissioner's determinations of contested facts) (subsequently repealed). Significantly, the ALS also failed to appeal to the Appellate Division within forty-five days of receiving notice of the DEP's action. That failure activates the bar of *R.* 2:4–1(b), which precludes ALS from appealing the original DEP permit, including DEP's waiver of the Policy.

Because DEP subsequently modified the permit, the Appellate Division characterized it as an "intermediate" determination. 290 *N.J.Super.* at 509, 676 *A.*2d 161. Only because the DEP in 1991 requested that Gateway modify its project, however, did the original permit decision become "intermediate." Absent the DEP's request, the DEP's original decision in 1989 was final. Hindsight cannot transform a decision that was final when made

into one that is merely intermediate. A contrary result would lead to the conclusion that no permit for a project would be final until construction was complete. Such a result could lead to the further conclusion that a future change would render interlocutory the major modification from which the ALS appeals as a final agency decision.

C. 1992 Grandparenting Decision

 Notwithstanding the DEP's conclusion that application of the Policy to Gateway's project would be unfair, the ALS argues that the sole justification for the waiver was the provision for intercept parking in the original permit. Its argument continues that the elimination of intercept parking converts the project into one that differs from the original project. The ALS concludes that the waiver of the Policy does not apply to the "new" project. It also concludes that the DEP's 1993 decision to "grandparent" the Policy into the major modification permit is a new decision that renders irrelevant the ALS's failure to appeal from the issuance of the original permit in 1989. The Appellate Division likewise concluded that the DEP's decision to grandparent the waiver in 1992 was a "final" administrative determination. 290 *N.J.Super.* at 510, 676 *A.*2d 161. We disagree.

Director Weingart notified Gateway on January 3, 1992, that the DEP would continue the waiver of the Policy for the same reason expressed in the November 20, 1986 letter—the unfairness of applying the Policy to the project given the project's unique administrative history. By 1992, the DEP had eliminated the requirement of intercept parking and asked Gateway to make appropriate modifications to its project. Given Gateway's enhanced reliance on the waiver during the interim, however, the initial justification for the waiver remained.

Consequently, the DEP did not make a "second" decision to waive the Policy. Instead of reevaluating the criteria applicable to the 1986 decision, the DEP merely confirmed the legal conclusions and factual findings contained in its November 1986 letter. Con-

trary to the conclusion of the Appellate Division, 290 *N.J.Super.* at 510, 676 *A.*2d 161, the DEP's January 3, 1992 letter reveals that the DEP regarded the Policy as inapplicable to the proposed major modification. The letter states that the DEP requested only the "information needed to evaluate the proposed changes in the project, as we will not need to reevaluate issues resolved during the review of the original permit application." Because the DEP had resolved the issue during the review of the application for the original permit, it did not reevaluate the waiver. The DEP's January 3, 1992 letter merely confirmed that, despite the elimination of intercept parking, the conditions in the original permit, including the waiver of the Policy, would continue. Thus, the waiver of the Policy, which the ALS had not challenged after the DEP issued the original permit, remained an unreviewable condition of the original permit.

D. 1993 Major–Modification Permit

Like the grant of the original permit, the DEP's approval of Gateway's major-modification permit on November 9, 1993 was a final administrative determination. Consistent with the regulations in effect in 1993, the DEP, after accepting Gateway's application, held a public hearing and notified interested parties, including the ALS. *See N.J.A.C.* 7:7–4.4(a)(1) to –4.8 (describing DEP review of CAFRA applications). As with the 1989 permit, the major-modification permit allowed Gateway to commence construction subject to numerous conditions. Accompanying the decision was a twenty-page summary report that outlined the DEP's factual findings. Consequently, the November 1993 major modification permit provided unmistakable written notice of the finality of the DEP's decision. The ALS timely appealed to the Appellate Division within forty-five days, as required by *R.* 2:4–1(b).

The ALS contends, however, that it may appeal not only from the 1993 major-modification permit, but also from the 1989 permit. By appealing from the 1993 decision, the ALS hopes to resuscitate

its expired right to appeal from the permit decision made four years earlier.

Under the regulations in effect in 1993, the DEP distinguished between requests for permit modifications that were "minor" and those that were "not minor" or major. *N.J.A.C.* 7:7–4.10 (amended July 18, 1994). "Minor modifications" were those "which do not result in a significant change in the scale, design, use or impact of the project as approved." *N.J.A.C.* 7:7–4.10(b). The determination of the significance of a modification rested within the sole discretion of the Division. *Ibid.* Requests for minor modifications were to be acted on within thirty days and "shall generally be approved by the Division." *N.J.A.C.* 7:7–4.10(b); *N.J.A.C.* 7:7–4.10(c) (amended July 18, 1994).

In contrast, major modifications required "an amended permit application, including a new CP–1 form, and any additional information necessary to review the proposed modification." *N.J.A.C.* 7:7–4.10(d)(1) (amended July 18, 1994). Thus, while minor modifications were approved as a matter of course, major modifications received more thorough review. Even so, the DEP, when reviewing Gateway's modifications, did not review the entire project from its inception. Although DEP reviewed Gateway's application for a major-modification permit as it would an application for a new permit, the DEP limited its review to the proposed modifications.

Generally speaking, judicial review of administrative action is limited to determining "whether the action is arbitrary, capricious, and unreasonable or unsupported by substantial credible evidence." *Texter v. Department of Human Servs.*, 88 *N.J.* 376, 382, 443 *A.*2d 178 (1982). Given the unique history and scope of this project, we cannot conclude that the DEP abused its discretion by deciding to review only the modifications to Gateway's project.

Intercept parking was only one part of Gateway's original project. Thus, the major-modification permit, which eliminated

that parking, did not describe "essentially a different project." As the DEP noted in the major-modification permit decision, "the balance of the proposed development is unchanged." The major-modification permit merely reduced the number of parking spaces and substituted the commercial space and day-care center with a fashion outlet shopping center. Moreover, the modified project generally fits within the "footprint" of the originally proposed intercept parking lot. The project still contains 2034 hotel rooms, a 20–acre dredge disposal site, a 205–acre wildlife management area, and a 120–acre wetland mitigation bank. According to the DEP's statement when it issued Gateway's major modification permit, the project as modified will produce a lesser environmental effect than the original project. The amended project also provides public benefits in lieu of intercept parking. Those benefits include the wetlands mitigation bank, the dredge spoils disposal site, a luxury tax on hotel rooms paid to Atlantic City, and the wildlife management area.

When the DEP waived its Policy in 1986 and issued a conforming CAFRA permit in 1989, the ALS should have appealed those decisions at that time. The ALS's failure to challenge those determinations precludes it from challenging them now. Our review of the record and the ALS's briefs leads us to conclude that the ALS has never objected to Gateway's subsequent modifications, except insofar as those modifications relate to the DEP's waiver of the Policy. Similarly, the ALS has questioned the lack of public benefits from the subsequent modifications only in connection with its challenge to DEP's waiver. Indeed, at oral argument before us when asked whether the ALS intended to challenge the changes to the project in the major-modification permit, counsel for the ALS responded:

I don't think those are really issues of serious right of appeal because they are all agency discretion.... I'm not looking to get involved in the nit-picking of the wetlands mitigation or dredging or anything else, I'm going to the heart of the matter [with the waiver issue.]

In sum, the only issue before us is whether the modifications require us to set aside the DEP's waiver of the Policy. We

conclude that the modifications do not justify that result. Because we hold that the ALS did not timely challenge the DEP's decision to waive the Policy, we need not reach the issue of whether such a challenge is barred by the doctrines of latches and estoppel.

## III.

In the present case, the DEP adopted regulations concerning the waiver of its procedural rules, *N.J.A.C.* 7:7–1.9 (subsequently recodified at *N.J.A.C.* 7:7–1.10), but not its substantive rules. The DEP would have better served the public interest had it adopted a regulation pertaining to the waiver of substantive considerations, such as the Policy. Nonetheless, our resolution of this matter obviates the need for detailed consideration of whether an administrative agency has the inherent power to waive its substantive regulations. *See SMB Assocs., supra,* 137 *N.J.* at 60, 644 *A.*2d 558 ("We need not resolve in this case the breadth of an agency's power to waive regulatory requirements or whether a rule authorizing waiver is always necessary.").

Absent a regulation providing for waiver, a question arises whether an agency may waive its substantive regulations. *See County of Hudson v. Department of Corrections,* 152 *N.J.* 60, 71–73, 703 *A.*2d 268 (1997) ("Absent a statute or regulation authorizing the waiver of otherwise valid and enforceable administrative regulations, an agency generally should not waive its own duly-enacted regulations by disregarding them."); *Dougherty v. Department of Human Servs.,* 91 *N.J.* 1, 8, 12, 449 *A.*2d 1235 (1982) (reversing Appellate Division's waiver of agency's reimbursement regulation on grounds that agency should first consider waiver); *Texter v. Department of Human Servs.,* 88 *N.J.* 376, 383, 443 *A.*2d 178 (1982) (noting that administrative agencies possess wide discretion in authority to select means and procedures by which to meet their statutory objectives); *Iuppo v. Burke* 162 *N.J.Super.* 538, 550–52, 394 *A.*2d 96 (App.Div.1978), *certif. denied,* 79 *N.J.* 462, 401 *A.*2d 219 (1978) (holding that Commissioner was bound by Board of Education's regulation requiring him to classify schools

and that he improperly suspended regulation without formal amendment procedures, but denying affirmative remedy). *See also United States ex rel. Accardi v. Shaughnessy,* 347 *U.S.* 260, 267, 74 *S.Ct.* 499, 503, 98 *L.Ed.* 681 (1954) (holding that, as long as regulation empowering Board of Immigration Appeals to exercise discretion in individual cases remained operative, the Attorney General "denies himself the right to sidestep the Board or dictate its decision in any manner"); *United States v. Nixon,* 418 *U.S.* 683, 695, 94 *S.Ct.* 3090, 3101, 41 *L.Ed.*2d 1039 (1974) (holding that, as long as regulation giving Special Prosecutor authority to contest the invocation of executive privilege remained in force, the Executive Branch was bound to it); *Clean Ocean Action v. York,* 57 *F.*3d 328, 333 (3rd Cir.1995) (agency is bound by express terms of its regulations until it amends or revokes them); *Gray Lines Tour Co. v. Interstate Commerce Comm'n,* 824 *F.*2d 811, 814 (9th Cir.1987) (while agency must ordinarily follow its own rules and regulations, "it can alter previously announced policies, or fashion exceptions, if it reasonably explains the alteration"); *Cleveland Clinic Florida Hosp. v. Agency for Health Care Admin.,* 679 *So.*2d 1237, 1242 (Fla.App.Ct.1996), *appeal denied,* 695 *So.*2d 701 (Fla. 1997) (holding that, "without question," agency must follow own rules; if rule proves impractical, it can be amended pursuant to established rulemaking procedures); *Springwood Assocs. v. Health Facilities Planning Bd.,* 269 *Ill.App.*3d 944, 207 *Ill.Dec.* 287, 289, 646 *N.E.*2d 1374, 1376 (1995), *appeal denied,* 163 *Ill.*2d 589, 212 *Ill.Dec.* 438, 657 *N.E.*2d 639 (1995) ("Generally, administrative agencies must follow their own rules as written, without making *ad hoc* exceptions or departures therefrom in adjudicating."); *Greenberg v. Secretary of Dep't of Revenue & Taxation,* 416 *So.*2d 205, 207 (La.Ct.App.1982) (holding that, while administrative agency could change rules via proper procedure, it cannot waive, suspend, or modify its own rules and regulations "absent special circumstances"); *Salaam v. Comm'r,* 43 *Mass.App.Ct.* 38, 680 *N.E.*2d 941, 944 (1997) (holding that government agency must respect its own regulations "as long as they exist on the books"); *Micu v. City of Warren,* 147 *Mich.App.* 573, 382 *N.W.*2d 823, 828

(1985) (once promulgated, rules may not be violated or waived by agency that issued them); *Eastwood Bldg. Comm. v. Berman,* 118 *Misc.*2d 494, 461 *N.Y.S.*2d 184, 185 (Sup.Ct.1983) ("While an agency may sometimes waive its own rules 'in the interests of justice,' it certainly may not do so where the substantive rights of individuals are prejudiced."); *Lyden Co. v. Tracy,* 76 *Ohio St.*3d 66, 666 *N.E.*2d 556, 559 (1996) (acknowledging that administrative agencies are bound by own rules until duly changed); 2 Kenneth C. Davis, *Administrative Law Treatise* § 7:21 (2d ed. 1979 & Supp.1989) (concluding legislative rules are "clearly" binding on issuing agency because valid legislative rules have the effect of a statute); 1 Charles H. Koch, Jr., *Administrative Law and Practice* § 3.73 (1985 & Supp.1997) (concluding that agency generally must follow its own legislative rules).

In general, an administrative agency should follow its own rules and regulations. If an agency wants to amend a rule or regulation, it may do so expressly after providing notice and a hearing. *N.J.S.A.* 52:14B–5. Similarly, an agency that seeks the power to waive its substantive regulations should adopt a regulation pertaining to any such waiver and setting forth appropriate standards to govern agency decision-making. Absent such a regulation, applicants, interested parties, and others may not know the rules of the game. The agency, moreover, opens itself to attack on the grounds that it did not have the implicit power to waive a substantive regulation.

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.