772 A.2d 45 (2001)
339 N.J. Super. 429
In the Matter of William CARROLL.
Superior Court of New Jersey, Appellate Division.
Argued February 7, 2001.
Decided April 24, 2001.
*46 Stephen E. Trimboli, Morristown, for appellant Morris County Sheriff (Courter, Kobert, Laufer & Cohen, Ronald Kevitz, Morris County Counsel, and Fredric M. Knapp, Special County Counsel, attorneys; Mr. Trimboli, on the brief).
Anthony M. Arbore, Ledgewood, for respondent William Carroll (Forster & Arbore, attorneys; Mr. Arbore, on the brief).
Elizabeth M. Laufer, Deputy Attorney General, for Merit System Board (John J. Farmer, Jr., Attorney General, attorney; Michael J. Haas, Assistant Attorney General, of counsel; Ms. Laufer, Deputy Attorney General, on the brief).
Zazzali, Zazzali, Fagella & Nowak, Newark, for Amicus Curiae, New Jersey State Policemen's Benevolent Association, (Robert A. Fagella and Jason E. Sokolowski, on the brief).
Before Judges BAIME and WALLACE, and LINTNER.
The opinion of the court was delivered by WALLACE, JR., J.A.D.
Following a department hearing, William Carroll was found guilty of acts of alleged wrongful conduct resulting in termination. On appeal, the Administrative Law Judge (ALJ) recommended dismissal of all charges and reinstatement. The Merit Systems Board (Board) accepted the recommendation of the ALJ and ordered reinstatement. This appeal followed. We affirm.
Carroll was employed with the Morris County Sheriff's Office for thirteen years. On December 4, 1997, Carroll was asked to be interviewed by Detectives Richard Rose and Anthony Calamito of the Morris County Prosecutor's Office. The stated purpose of the interview was to question Carroll concerning the prosecutor's investigation of allegations that garbage from the Sheriff's Office was emptied improperly by Morris County Buildings and Grounds employees. Carroll was instructed that the interview was voluntary, he could stop answering questions, and he was free to leave at any time. During the interview, Carroll revealed that during a morning inspection the week before, officer John Cicchetti said he knew someone who had buried the chemical Agent Orange behind the Morris County Police Academy. There were about seven or eight other officers in the room at the time. Carroll recalled another officer stating that Cicchetti knew where the Agent Orange was buried because his cousin was the person responsible for burying the Agent Orange.
At some point, Carroll was asked if he had heard of such an incident prior to that morning inspection. Carroll replied that he was "not comfortable" about answering that question, and that he would like to talk to a lawyer. A short while later, Carroll again expressed discomfort about *47 answering whether he remembered whom he had talked to about the incident. Carroll said he wanted to ask an attorney a couple of questions. Carroll answered all of the other questions posed by the investigators. At the conclusion of the interview, Carroll said his answers were voluntarily given and that he had been treated fairly. Further, the investigators informed Carroll that any falsehoods may subject him to penalties. The interview was concluded without a scheduled follow-up session.
The next day Carroll met with attorney Michael Rubbinaccio, who represented Carroll in another matter. Carroll related to Rubbinaccio the substance of his interview with the investigator. Rubbinaccio indicated that due to a conflict he could not advise Carroll with respect to the two unanswered questions. Rubbinaccio suggested that Carroll need not obtain other counsel unless the Prosecutor's Office contacted him for further questioning.
On December 15, 1997, without advance notice, the same two detectives requested Carroll to answer additional questions. Michael Lowe, an Internal Affairs (IA) Officer from the Sheriff's Office, was also present. The stated purpose of the meeting was to clarify some of Carroll's responses during the December 4 interview. Carroll said that he would like to have an attorney present. One of the detectives assured Carroll he was not in custody and not the target of the investigation, and free to leave "on the criminal side." When Carroll asked if he were free to leave on the administrative side, the interview was turned over to Lowe as an internal affairs investigation. Lowe told Carroll he had no right to refuse to answer or to demand counsel during the questioning on possible disciplinary matters. Carroll replied that he wanted to talk to an attorney. Lowe then informed Carroll that he was being offered immunity. Lowe stated:
You [have] been granted immunity from criminal prosecution in the event your answers to the narrow questions asked implicate you in a criminal offense. This immunity has been granted to you through the Prosecutor ... John B. Dangler by the Attorneys [sic] General's Office on December 15, 1997. No answer given by you nor evidence derived from your answer may be used against you in a criminal proceeding. You must now answer questions specifically directed and narrowly related to the performance of your official duties and your fitness for office. If you refuse to answer you may be subject to disciplinary charges for refusal which can result in your dismissal from the Morris County Sheriff's Office. Anything that you say may be used against you in any in any subsequent disciplinary charges.
Lowe then showed Carroll a form explaining the grant of immunity and asked him to sign it. Carroll refused unless he could first talk to his attorney and reiterated his refusal to answer questions. The interview was concluded.
On December 17, 1997, Carroll was suspended and charged with:
1. On December 4, 1997, Sheriff's Officer William Carroll refused to answer questions asked by the Morris County Prosecutor's Office concerning information he possessed relevant to an ongoing criminal investigation of which he was not a target.
2. On December 15, 1997, Sheriff's Officer William Carroll refused to answer questions asked by the Morris County Prosecutor's Office concerning information he possessed relevant to an ongoing criminal investigation of which he was not a target.
3. On December 15, 1997, Sheriff's Officer William Carroll refused to answer questions by, and refused to *48 render material and relevant statements to, competent authority in a department personnel investigation when so directed, which personnel investigation was narrowly and directly related to his performance of his official duties.
4. Between November 18, 1997 and December 5, 1997, Sheriff's Officer William Carroll was in possession of information concerning possible criminal activity, information of concern to the Sheriff's Office, and information regarding other officer's failure to comply with Department rules, but failed to report same promptly.
On January 6, 1998, prior to any disposition on the charges, Carroll voluntarily appeared with his attorney to answer the questions he had previously declined to answer. The same two detectives advised Carroll he was not the target of the garbage-dumping investigation and that he was free to leave at any time. They reminded Carroll that the prior grant of immunity was still in effect. Carroll and his attorney stated that Carroll had never refused to cooperate, but simply wanted to talk to an attorney before answering the questions. Carroll explained that he had felt intimidated and confused, and that his job might be in jeopardy. He had not brought counsel to the December 15 interview because he had no advance notice of it.
Carroll then responded to all of the questions asked by the investigators. He explained that after hearing Cicchetti's story about Agent Orange, he contacted John Fox, the Police Liaison on the Freeholder Board, to report what he heard. Carroll said that earlier in 1997, he told Fox about a rumor he heard about Agent Orange being buried behind the police academy. He said that Fox called him several times that year and asked if he could find out more information. Carroll told Fox about Cicchetti's remarks because Fox was an officer of the County and Carroll believed Fox would look into the matter. As far as Carroll knew, the allegation was an unsubstantiated rumor. Carroll further related that following the December 4, 1997 interview, he reported Cicchetti's comments to his sergeant in a memo.
Following a three-day departmental hearing, Carroll was found guilty of the charges. He was removed from his position on February 27, 1998. Carroll appealed his removal to the Board. The matter was referred to the Office of Administrative Law. A hearing was held on January 25, 1999, before an ALJ. After reviewing all of the testimonial and documentary evidence submitted, the ALJ concluded that the Sheriff's Office violated Carroll's right to consult with an attorney prior to questioning concerning an Internal Affairs investigation. The ALJ recognized that N.J.S.A. 40A:14-181, enacted as part of the Law Enforcement Protection Act in 1996, mandated all law enforcement agencies in this State to adopt and implement policies and procedures "consistent with" the guidelines set forth in the "Internal Affairs Policy and Procedures" manual promulgated on behalf of the Attorney General by the Division of Criminal Justice (AG Guidelines). The ALJ noted that AG Guideline 11-26[1] specified that while an officer being interviewed in an Internal Affairs investigation does not have a Sixth Amendment right to counsel, the officer has the right to "obtain" an attorney. The *49 ALJ also found that Carroll did not refuse to answer the questions but clearly wanted to consult with counsel before responding. The ALJ concluded that the charges should be dismissed and ordered Carroll reinstated with back pay.
The Board adopted the findings and conclusions of the ALJ and rejected each of appellant's claims. With regard to appellant's claim that Carroll failed to report the information concerning possible criminal activity promptly, the Board found there "were a plethora of rumors being circulated about the Agent Orange" and accepted Carroll's interpretation that the statement of his fellow officer that his cousin had dumped the material twenty-five years before was just another rumor. The Board concluded on this issue:
Given the remoteness in time of the alleged burial of the material and the widely acknowledged rumors that were currently being spread around the Morris County Sheriff's Office about the Agent Orange, the appellant's interpretation of the information as non-factual and, therefore, not immediately reporting it to his superiors or submitting an immediate report does not warrant any type of disciplinary charge.
The Board ordered that Carroll be reinstated.
Appellant appeals and raises the following arguments in his brief:
POINT I:
THE DECISION BELOW IS ARBITRARY, CAPRICIOUS AND CONTRARY TO LAW TO THE EXTENT THE AGENCY FAILED TO SUSTAIN DISCIPLINE AGAINST RESPONDENT FOR HIS FAILURE TO PROMPTLY REPORT INFORMATION OF CONCERN TO THE SHERIFF'S OFFICE. FAILING TO COOPERATE WITH PROSECUTOR'S INVESTIGATORS ON DECEMBER 4, 1997, AND FILING OF A LATE, INADEQUATE AND INCOMPLETE REPORT.
POINT II:
THE DECISION BELOW IS CONTRARY TO ESTABLISHED LAW IN THE STATE OF NEW JERSEY, WHICH HOLDS THAT A LAW ENFORCEMENT OFFICER WHO IS GRANTED USE IMMUNITY AND IS THEN WARNED OF THE CONSEQUENCES OF DECLINING TO ANSWER MAY LAWFULLY BE TERMINATED IF HE THEREAFTER REFUSES TO ANSWER WORK-RELATED QUESTIONS PUT TO HIM BY HIS EMPLOYER.
POINT III:
THE MERIT SYSTEM BOARD'S DECISION BELOW IS CONTRARY TO LAW TO THE EXTENT IT HOLDS THAT N.J.S.A. 40A:14-181 GRANTED RESPONDENT THE RIGHT TO CONSULT WITH COUNSEL BEFORE RESPONDING TO QUESTIONS POSED DURING AN INTERNAL AFFAIRS INVESTIGATION, A RIGHT NOT RECOGNIZED IN BANCA OR BY THE USE IMMUNITY STATUTES.
POINT IV:
THE MERIT SYSTEM BOARD DECISION BELOW IS ARBITRARY, CAPRICIOUS AND CONTRARY TO LAW IN THAT IT INCORRECTLY INTERPRETED THE AG GUIDELINES AS CREATING ENFORCEABLE RIGHTS FOR INDIVIDUAL POLICE OFFICERS.
POINT V:
ASSUMING, ARGUENDO, THAT THE AG GUIDELINES ARE CONTROLLING, THE SHERIFF'S OFFICE ACTED CONSISTENT WITH THEIR REQUIREMENTS. THUS, *50 THE MERIT SYSTEM BOARD ACTED ARBITRARILY, CAPRICIOUSLY, AND CONTRARY TO LAW BY VACATING THE DISCIPLINE IMPOSED UPON RESPONDENT.
POINT VI:
THE DECISION BELOW IS ARBITRARY, CAPRICIOUS AND CONTRARY TO LAW TO THE EXTENT IT IS BASED ON THE AG GUIDELINES, BECAUSE THAT DOCUMENT IS CONTRADICTORY AND UNDULY VAGUE WITH REGARD TO THE RIGHT TO COUNSEL.
POINT VII:
THE MERIT SYSTEM BOARD COMMITTED LEGAL ERROR, AND REACHED AN ARBITRARY AND CAPRICIOUS RESULT, BY EXCUSING RESPONDENT'S REFUSAL TO COOPERATE WITH CPL. LOWE, AND LATER GRIEVE THE ALLEGED VIOLATION OF HIS RIGHT TO COUNSEL.
Initially, we note our limited role in reviewing an administrative decision. Karins v. City of Atlantic City, 152 N.J. 532, 540, 706 A.2d 706 (1998). We will not set aside the determination of an administrative agency unless it is arbitrary, capricious, unsupported by substantial credible evidence contained in the record, or in violation of express or implicit legislative policy. In re CAFRA No. 87-0959-5, 152 N.J. 287, 304, 704 A.2d 1261 (1997); Henry v. Rahway State Prison, 81 N.J. 571, 579-80, 410 A.2d 686 (1980). We must determine whether the findings of the agency could reasonably have been reached on sufficient credible evidence presented in the record, "considering `the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." In re Taylor, 158 N.J. 644, 656, 731 A.2d 35 (1999) (citation omitted). Moreover, a "strong presumption of reasonableness attaches to the actions of the administrative agencies." In re Vey, 272 N.J.Super. 199, 205, 639 A.2d 724 (App.Div.1993), aff'd, 135 N.J. 306, 639 A.2d 718 (1994). However, we are not bound by the agency's interpretation of a statute or resolution of a question of law. In re Taylor, supra, 158 N.J. at 658, 731 A.2d 35.
We turn now to appellant's main argument that once Carroll was granted use immunity, regardless of his request to consult with counsel and regardless of any right to counsel granted by the AG Guidelines, that Carroll was required to answer the questions. Specifically, appellant urges that Banca v. Phillipsburg, 181 N.J.Super. 109, 436 A.2d 944 (App.Div. 1981) requires this result. Carroll, the Board and amicus respond that while Banca states the governing law of use immunity, it does not purport to resolve disputes over right to counsel which are controlled by the AG Guidelines and that those Guidelines do not conflict with Banca.
In Banca, a police officer was questioned by his superior about his suspected involvement in a theft from the property room. Miranda warnings were given, but he was not told he might be disciplined for failing to answer or that he would be granted use immunity in any criminal proceeding. When he refused to cooperate on advice of counsel, he was charged with a disciplinary violation and was suspended after a hearing. The Civil Service Commission overturned his suspension because the officer had not been offered use immunity. In affirming that decision, we pointed to the
constitutional doctrine that a public employee is not subject to disciplinary sanction solely by reason of his exercise of his privilege against self-incrimination during the course of official interrogation unless he has first been accorded *51 the protection of use immunity barring admission in a subsequent criminal proceeding of any self-incriminating statement he may make.
[Id. at 113, 436 A.2d 944 (emphasis added).]
We noted that the rationale for this exception to the prohibition against coerced incrimination is that if the officer
is protected from the normal consequences of a self-incriminatory statement, that is, if the statement may not be used against him in a subsequent criminal proceeding, then the choice he must make between loss of his employment and the giving of the statement, however much a Hobson's choice it may be, does not offend his constitutional privilege. The offer, therefore, of use immunity when the statement is solicited is constitutionally prerequisite to the imposition of the disciplinary sanction for failing to give it.
[Ibid.]
We concluded that the officer should have been clearly advised of his use immunity at the outset as a prerequisite to the subsequent imposition of a disciplinary sanction for refusal to make a statement. Id. at 116, 436 A.2d 944. Further, we explained that the officer must be advised that his refusal could subject him to that disciplinary action. Ibid.
Our holding in Banca is consistent with United States Supreme Court case law. See, e.g., Garrity v. New Jersey, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562, 567 (1967)(holding "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under the threat of removal from office"); Lefkowitz v. Turley, 414 U.S. 70, 84, 94 S.Ct. 316, 325-26, 38 L.Ed.2d 274, 285-86 (1973) ("given adequate immunity, the State may plainly insist that employees either answer questions under oath about the performance of their job or suffer the loss of employment"); Gardner v. Broderick, 392 U.S. 273, 277-79, 88 S.Ct. 1913, 1915-16, 20 L.Ed.2d 1082, 1086-87 (1968) (policeman may be discharged for refusing to answer questions about his conduct, if he is granted use immunity).
Subsequent to our decision in Banca, the Attorney General in 1991 issued the "Internal Affairs Policy and Procedures," which was a chapter in the Police Management Manual, a publication developed by the Division of Criminal Justice and the State Association of Chiefs of Police "as a standard for municipal police management." (AG Guideline 11-1).
In this regard we note that the Attorney General is the chief law enforcement officer of this State. N.J.S.A. 52:17B-98. The Legislature has authorized the Attorney General to provide for "uniform and efficient enforcement of the criminal law and the administration of criminal justice throughout the State." Ibid. Consistent with this authority, the Attorney General has issued guidelines concerning the appropriate application of the criminal laws.
Our Supreme Court has acknowledged the validity of various guidelines issued by the Attorney General. See generally State v. Brimage, 153 N.J. 1, 24-25, 706 A.2d 1096 (1998) (the Attorney General was instructed to reevaluate and issue new plea offer guidelines to assist all counties in consistently applying the Comprehensive Drug Reform Act of 1997); Doe v. Poritz, 142 N.J. 1, 109-111, 662 A.2d 367 (1995) (holding constitutional, as modified, Attorney General's Guidelines for implementation of convicted sex offender registration and community notification statutes); Rawlings v. Police Dep't of Jersey City, 133 N.J. 182, 192, 627 A.2d 602 (1993) *52 (Court cites with approval the Attorney General's Law Enforcement Drug Screening Guidelines); State v. Lagares, 127 N.J. 20, 32, 601 A.2d 698 (1992) (Court requires the Attorney General to issue guidelines which will assist prosecutors in rendering uniform decisions concerning enhanced drug testing).
We summarize the pertinent AG Guidelines. AG Guideline 11-26 recognizes that the Sixth Amendment right to counsel does not extend to internal investigations. However, it also notes that officers should be permitted to obtain counsel if they so desire. (AG Guideline 11-26). AG Guidelines 11-35 and 11-36 further provide that, in accordance with the decision in Banca, once use immunity is granted, the department shall advise the officer of the terms and conditions of that immunity. Id. at 11-35 & 11-36. Further, the AG Guidelines provide ten statements which must be read to the officer, including a statement that the officer must answer all questions and that any refusal to respond could result in the officer's dismissal. Id. at 11-36. AG Guideline 11-36 expressly provides that the officer has the right to consult with a union representative or any other representative of his choice and have the representative present during the interview. Ibid.
Before beginning any interrogation, the officer must be given a form containing these eight provisions:
1. You are being questioned as part of an official investigation of this agency into potential violations of department rules and regulations. This investigation concerns (the matter under investigation).
2. You will be asked questions specifically directed and narrowly related to the performance of your official duties and your fitness for office.
3. You have the right to refuse to answer any questions or make any statements that might incriminate you in a criminal matter.
4. If you fail to exercise this right, anything you say may be used against you in a criminal proceeding.
5. The right to refuse to answer a question on the grounds of your right against self-incrimination does not include the right to refuse to answer on the grounds that your answer may reveal a violation of a department policy, rule, or regulation that is not a criminal offense.
6. You may be subject to departmental discipline for refusal to give an answer that would not implicate you in a criminal offense.
7. Anything that you say may be used against you not only in any subsequent department charges, but also in any subsequent criminal proceeding.
8. You have the right to consult with a representative of your collective bargaining unit, or another representative of your choice, and have them present during the interview.
[AG Guidelines 11-33 & 11-34.]
Once the prosecutor offers use immunity, the officer shall be advised according to AG Guidelines 11-35 and 11-36, which adds provisions regarding use immunity.
On January 9, 1997, the Legislature enacted the Law Enforcement Protection Act. The Legislature mandated that
Every law enforcement agency shall adopt and implement guidelines which shall be consistent with the guidelines governing the "Internal Affairs Policy and Procedures" of the Police Management Manual promulgated by the Police Bureau of the Division of Criminal Justice in the Department of Law and Public *53 Safety, and shall be consistent with any tenure or civil service laws, and shall not supersede any existing contractual agreements.
[N.J.S.A. 40A:14-181 (emphasis added).]
Contrary to appellant's contention, we find no inconsistency with the AG Guidelines regarding counsel and our decision in Banca. As noted above, AG Guideline 11-26 recognizes that the Sixth Amendment right to counsel does not extend to internal investigations and directs that officers should be permitted to obtain counsel if they so desire. It is obvious that our decision in Banca did not address the right to counsel, but rather focused on use immunity and an officer's Fifth Amendment privilege against self-incrimination. Moreover, the AG Guidelines instruct law enforcement agencies to comply with Banca and direct the proper procedure to be followed in conducting an internal affairs investigation. In short, Banca and the right to counsel granted by the AG Guidelines are complementary and not inconsistent.
Here, with regard to the December 4, 1997 interview conducted by the Prosecutor's office, the investigators clearly informed Carroll that he was not the subject of a criminal investigation, that his cooperation was voluntary, and that he was free to leave at any time. The investigators did not inform Carroll that if he failed to respond to all of the questions he would be charged with insubordination or conduct unbecoming an officer. Consequently, consistent with the instructions given to him on December 4, 1997, Carroll committed no infraction by declining to answer two questions. The Board properly concluded that Carroll was not guilty of insubordination, conduct unbecoming a public employee, or any other related charges for his conduct on December 4, 1997.
With regard to the December 15 interview, Lowe informed Carroll he was granted use immunity, but Lowe did not inform Carroll of his right to counsel as required by AG 11-36. Nor did Lowe orally advise Carroll of his right to consult with a representative of his collective bargaining unit or any other representative of his choice. Nevertheless, Carroll sought to consult with counsel. Consequently, the Board found that appellant failed to follow the AG Guidelines and that Carroll's right to consult with counsel was violated. We find no cause to interfere with that determination which is supported by substantial credible evidence.
Nevertheless, appellant argues that even if the AG Guidelines were applicable, they are unenforceable because they are "rules" which were not promulgated pursuant to the Administrative Procedure Act (APA). We disagree.
The APA provides in part:
(e) "Administrative rule" or "rule," when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases.
[N.J.S.A. 52:14B-2(e) (emphasis added).]
In our view, at a minimum, the AG Guidelines fall within the statutory exception for "statements concerning the internal management or discipline of any agency." The AG Guidelines expressly govern Internal Affairs investigations with local law enforcement agencies. The purpose of the AG Guidelines is to establish *54 procedures for investigating employee misconduct and for determining whether criminal or disciplinary action is required. In short, the AG Guidelines fall within the exception of an administrative rule. Consequently, the AG Guidelines were not required to be promulgated pursuant to the APA.
Defendant's remaining arguments are wholly devoid of substance and are clearly without merit. R. 2:11-3(e)(1). Suffice it to say that there was sufficient credible evidence for the Board to reject each of the charges and to order Carroll's reinstatement.
We affirm essentially for the reasons expressed by the Board and the ALJ.
NOTES
[1] The manual will be referred to as AG Guideline and the number refers to the page where the guideline is found.